IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RONNIE ALEXANDER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| SOUTHERN HEALTH PARTNERS, INC.; | § | CIVIL ACTION NO. 3:22-cv-395 |
| PHILIP R. TAFT, | § | |
| PSY.D & ASSOCIATES PLLC; | § | |
| JACOB PARRAS; and TORI TAYLOR, | § | |
| | § | |
| *Defendants*. | § | |

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Ronnie Alexander files this First Amended Complaint pursuant to Rule 15(a)(1)(B) against Southern Health Partners, Inc., ("SHP"); Philip R. Taft, Psy.D & Associates PLLC ("Taft"); and Henderson County Correctional Officers Jacob Parras and Tori Taylor. Parras and Taylor violated Alexander's constitutional right to be free from punishment as a pretrial detainee, while SHP and Taft fell short of the medical standard of care in treating Alexander, their patient. Plaintiff would respectfully show the Court the following:

## I.   INTRODUCTION

1.     This lawsuit is about a man who was subjected to a variety of inhuman, dangerous and degrading conditions while in solitary confinement for more than five consecutive days—treatment that could be considered a war crime if it was inflicted on an enemy combatant. This

1

was a senseless act of pure cruelty, perpetrated for no other reason than the jailers' apparent desire to put an inmate in his place.

2.      Jail staff had misclassified Ronnie Alexander as a maximum-security detainee, which placed him in the company of the most violent and lawless offenders housed at the Jail.

3.      Alexander's cellmates repeatedly threatened him, including threats to his life. Alexander asked to be moved; the guards, including Defendant Parras, denied him. Fearing for his life, Alexander believed the only way out was to tell the guards he was suicidal, prompting them to separate him from the inmates who were threatening him.

4.      In retaliation, Parras and other correctional officers placed Alexander in solitary confinement for more than five days. During that time, Alexander was never once allowed out of his cell for any reason: not to wash his hands, brush his teeth, take a shower, make a phone call, exercise—nothing. There was also no toilet in the cell, so Alexander was forced to relieve himself into a small drain in the middle of the floor. Alexander had to push his feces down through the narrow openings in the grate using pieces of paper cups. Alexander repeatedly asked for toilet paper, but was always denied, and so was forced to clean himself up with the same remnants of paper cups. During this time, the lights were left on throughout the day and night to prevent Alexander from sleeping. He was stripped naked and left with nothing but a suicide blanket. No bedding was provided—only a concrete slab. Alexander was also only provided with approximately 24 ounces of water each day—far less than the recommended amount—causing him to become progressively dehydrated.

5.      Meanwhile, medical staff employed by the Jail turned a willful blind eye to this inhumane treatment. Further, they assisted correctional officers in covering up the misconduct by falsifying documents intended to make it appear that Alexander had been placed in isolation for

treatment for alcohol withdrawal, despite the fact that they had previously observed him to be sober and not withdrawing from alcohol or drugs.

6.      By subjecting Alexander to such abuse, Defendants have violated his constitutional rights, and the medical provider Defendants have fallen far short of their profession's standard of care.

## II.    PARTIES

7.      Plaintiff Ronnie Alexander is a resident of the State of Texas.

8.      Defendant SHP is a Delaware corporation with its headquarters located in Tennessee.  SHP has made an appearance in this case.

9.      Defendant Taft is a Texas corporation based in Corsicana, Texas.  Taft has made an appearance in this case.

10.     Defendants Parras and Taylor are correctional officers at the Henderson County Jail.  Both officers have made an appearance in this case.

## III.    JURISDICTION AND VENUE

11.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.  Supplemental jurisdiction over state law claims against SHP and Taft is proper under 28 U.S.C. § 1367 because those claims are so related to the claims under § 1983 that they are part of the same case.

12.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Taft resides in the Northern District of Texas, and all Defendants reside in Texas.  SHP resides in Texas by virtue of 28 U.S.C. § 1391(c)(2); the State of Texas may exercise specific personal jurisdiction over SHP, a corporation, because its conduct within Texas gave rise to these claims.

## IV.   <u>FACTUAL ALLEGATIONS</u>

13.     Ronnie Alexander was booked into the Henderson County Jail ("the Jail") in the very early morning of March 8, 2021, just after midnight.

14.     His intake screening noted that he was not suicidal and showed no signs of intoxication.  And in fact, Alexander was not suicidal, intoxicated, or withdrawing from drugs or alcohol.  As such, the Jail took no special precautions regarding his detention.

15.     The only medications authorized by Jail medical staff at intake were Clonidine and Lisinopril, which Alexander had previously been prescribed for high blood pressure.

16.     For the first two days at the Jail, Alexander was in a holding cell.  During that time, he was seen twice by Jessica Phlips, a mental health professional employed by Defendant Philip R. Taft, Psy.D & Associates, which had contracted with Henderson County to provide mental health care to inmates at the Jail.

17.     On March 8, Phlips saw him for what she described as "observation clearance." Phlips failed to mark the boxes on the visit form regarding Alexander's mental status but did not note anything related to intoxication or alcohol withdrawal.

18.     On March 9, Phlips saw Alexander again as a follow-up.  On this visit, she noted on her form that she had "no concerns" as to Alexander's mental status, including appearance, behavior, speech and mood.  Again there is nothing noted to suggest intoxication or alcohol withdrawal; Phlips's documentation only says that Alexander complained of chest pain and sleep apnea, and that he needed to see medical for those issues.

19.     Similar to Taft, Southern Health Partners ("SHP") had been contracted by Henderson County to provide all of the medical care (other than mental health care) at the Jail.  All Jail medical staff who were not employed by Taft were employed by SHP.

20.     Progress notes made by medical staff indicate that Alexander was seen twice on the afternoon of March 9.  Both entries relate exclusively to Alexander's blood pressure and his prescriptions for Clonidine and Lisinopril.  Consistent with the intake screening, no mention is made of intoxication or alcohol withdrawal.

21.     The Jail then classified Alexander as a maximum-security detainee, despite the fact that his criminal record contained zero felony convictions and only a single prior, non-violent offense that had occurred nearly 30 years earlier.  Thus, on the evening of March 9, Alexander was placed in group detention with the most violent and dangerous men being held at the Jail.  Alexander observed that several of his fellow inmates bore tattoos of swastikas or similar hateful and intimidating symbols.

22.     Not long after Alexander was placed in group detention with these men, they began making threatening comments to Alexander.

23.     When Alexander told the guards he was afraid for his safety due to the threatening behavior of his cellmates, the guards responded that he "had nothing to worry about" and that his cellmates were "a good group of guys."

24.     The stress and fear created by this situation exacerbated Alexander's hypertension, causing him chest pains.  He was taken to the nurse's station; the nurse's progress notes show that he was seen at 11:20 p.m. on March 9.  His blood pressure was very high, but he also complained that his blood pressure was being adversely affected by his fear of the other inmates in his cell.  He asked to be placed in a cell by himself, which the progress notes say was denied.  The notes then state that Alexander was returned to the group detention cell.  No mention is made in these notes about intoxication or alcohol withdrawal, and in fact indicate that Alexander was lucid and

able to converse normally.  This is the last entry of nurse's progress notes that exists in Alexander's entire set of Jail medical records.

25.     Upon being returned to the group detention cell, Alexander's cellmates continued to intimidate and threaten him.  They made comments such as, "Ronnie's so stressed out right now, he's probably going to hang himself tonight...we can help him with that."  Then, they began constructing a makeshift noose from whatever they could find in the cell.

26.     Around the same time that Alexander's own cellmates were threatening his life, he saw another group of Henderson County inmates in the cell across the hall beat an inmate so severely that Alexander thought they had killed him.

27.     Alexander was terrified.  Thinking he had no other option, he told Defendant correctional officer Jacob Parras he was suicidal, believing that would force the Jail to get him out of the group detention cell for medical or mental health evaluation.

28.     Parras immediately responded, "Well, you fucked up now."  This set in motion more than five days of retaliatory torture involving the complete deprivation of numerous basic human needs.

29.     Just after midnight in the early morning of March 10, Parras and other correctional officers transferred Alexander to the so called "violent cell."  This cell has no sink or toilet; the only place for an inmate to urinate and defecate is into a drain in the middle of the floor.  However, the openings in the drain grate are too small for solid waste to pass through, so Alexander had to it down by hand using pieces of a paper cup.  Toilet paper was not provided, for which the paper cup was also used as a wholly ineffective substitute.  Alexander repeatedly asked for toilet paper from the guards, including Defendants Parras and Tori Taylor, but was refused every time.  There

were also the remnants of fecal matter and dried urine on the floor from other inmates who had spent time in the cell, which Alexander had to stand on with bare feet.

30.     Exacerbating this situation was the fact that there was no place for Alexander to wash his hands.  And because he was not provided utensils with his food, Alexander was forced to eat (and do everything else) with hands that were perpetually contaminated with fecal bacteria. This continued for the entire five-plus days Alexander was in isolation, since he was never once allowed to leave his cell.

31.     Alexander was also stripped naked and provided with only a thin "suicide blanket" to cover himself with.  No further bedding was provided, including a pillow, so Alexander was forced to sleep directly on a small concrete slab built into the wall.

32.     Alexander's ability to sleep was also severely inhibited by the Jail guards leaving the very bright lights in the cell on at all hours of the day.  This includes Defendant Taylor, who was assigned to the violent cell for several of the nights Alexander was being kept there. Surveillance video inside the cell shows that Alexander was mostly only able to sleep in short, intermittent bursts, which were both few and far between and also at seemingly random times of day.  In addition to preventing sleep, being subjected to five straight days of bright lighting with no respite is highly disorienting in itself, adding another layer to the psychological abuse Alexander was subjected to.

33.     Furthermore, Alexander was only provided approximately three eight-ounce beverages each day.  This is only a small fraction of the recommended fluid intake of 124 ounces per day for an adult male.  Alexander repeatedly asked for water but was consistently denied by multiple guards, including Taylor and Parras.  As a result, Alexander became increasingly dehydrated as his solitary confinement continued.

34.     Alexander was also given no opportunity over the more than five-day span to brush his teeth or bathe, despite multiple requests to take a shower and wash his hands.

35.     Because he was not allowed out of the cell for the entire five-plus days, Alexander was also prevented from getting any exercise or recreation time of any kind.

36.     Rounding out this program of systematic abuse, guards (including Taylor and Parras) tormented Alexander with repeated insults and threats.  For example, on one occasion they brought a police dog outside his cell and loudly discussed taking Alexander out to a field and unleashing the dog on him, while parading the dog back and forth outside the cell.  They threatened to kill Alexander using a "barbed wire guillotine," which involves placing barbed wire around a person's neck, attaching it to a vehicle on either side, and then driving the vehicles apart from one another so as to behead the victim with the barbed wire.  Even as late as the morning of March 15th, just before he was released to Dallas County custody, an officer said, "Ronnie Alexander, you are not leaving this facility alive."

37.     As offensive as such statements might be on any occasion, they were particularly disturbing to Alexander, whose state of mind had been progressively shattered by the ongoing abuse.  Moreover, Alexander had told the guards that he suffered from post-traumatic stress disorder; there is no doubt they knew that their threats would cause extra anxiety to him, particularly since he was currently in the midst of another highly traumatic situation.

38.     Defendants Taylor and Parras both participated in the abuse described above and encouraged other guards to do the same.  Each specifically denied Alexander's repeated requests for water, toilet paper, and an opportunity to shower or wash his hands.  Parras additionally made the initial decision to transfer Alexander to the violent cell and implement this program of abuse,

and Taylor oversaw the continuing abuse while she was assigned to supervise the violent cells for several of Alexander's five nights there.

39.     The treatment Defendants subjected Alexander to is unconscionable by any measure, but it also flagrantly contradicts numerous stated Jail policies, the obvious purpose of which are to prevent the cruel treatment of inmates.

40.     First, any transfer to an isolated cell, and the reason for doing so, is supposed to be documented.  Jail staff completely failed to document Alexander's placement in the violent cell.

41.     Second, the policies state that "an inmate identified by medical staff as potentially suicidal shall be housed in a separation cell (which is distinguished from a violent cell) pending further evaluation by appropriate health care officials."  No such evaluation ever occurred.

42.     After evaluation, the policies state that suicidal inmates may be placed in any of four increasingly restrictive environments.  These include general population with observation; general population during daytime and a separation cell at night; a separation cell at all times but potentially with supervised access to inmate programs and activities; and finally, the violent cell. However, even suicidal inmates placed in a violent cell may be allowed supervised access to inmate programs and activities.

43.     Here, the guards went beyond the most restrictive option without any evaluation by appropriate medical staff.  Furthermore, this was done despite (or more likely because of) the belief that Alexander was not genuinely suicidal: on a form for suicidal inmates that was filled out on the morning of March 10, approximately five hours after Alexander was put in the violent cell, the officer who completed the form checked only one box indicating that Alexander had made suicidal comments, but answered "no" to the question, "Does the arresting/transporting officer believe or has the officer received information that the inmate may be at risk of suicide?"  In fact, the officer's

completion of that form was so perfunctory that he checked "no" on every other available box, even though a few of them had been marked "yes" on Alexander's initial screening at book-in (such as, "Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things?").  This thoughtless treatment of serious medical records by Jail staff lays bare their true reason for placing Alexander in such conditions: punishment.

44.     Jail staff are also required to document their observation of suicidal inmates at intervals between 30 minutes and 5 minutes (or even continuous observation), depending on the seriousness of the risk as judged by medical staff.  This is done using a suicide observation log. Here, no log was used and not a single observation was recorded.

45.     Furthermore, Jail policy states that "inmates . . . that require separation . . . shall retain access to all services and activities unless specifically authorized by the Lieutenant, Captain, or Major for reasons that would adversely affect the safety and security of the Facility."  No such authorization was documented, nor is there any imaginable reason allowing Alexander access to a toilet, shower, or other activities would have placed the safety or security of the Jail in jeopardy.

46.     The policy manual continues: "The status of inmates confined to the violent cell shall be reassessed and documented every twenty-four hours for continuance of status."  Alexander was reassessed at most one time during the approximately 128 hours he spent in the violent cell; this was an abbreviated visit by Phlips on the morning of March 12, which is described further below.  Her visit can hardly be called a genuine "reassessment" because it makes no recommendation as to whether Alexander should remain in the violent cell or not, or any reasons for such a decision.

47.     Furthermore, "Inmates that are housed in single cells for administrative or disciplinary separation shall be allowed access to the shower at least once per day and a dayroom

for at least one hour per day."  Alexander was denied both of those basic needs the entire time he was in isolation.

48.     Additionally, use of the violent cell is strictly prohibited by Jail policy as a disciplinary measure.  The following adverse actions are also strictly prohibited as disciplinary measures: deprivation of clothing and bedding, except when the inmate has destroyed such items (and even then, deprivation of clothing or bedding is to be reviewed and documented every twenty-four hours); deprivation of items necessary to maintain an acceptable level of personal hygeine; and deprivation of physical recreation or physical exercise.  All of these punishments were employed against Alexander in what was clearly a disciplinary measure, exacted on him for telling the guards he was suicidal.

49.     These numerous, flagrant deviations from stated Jail policy all show that Alexander's treatment had nothing to do with being potentially suicidal, but were instead the pure expression of cruelty and retaliation.

50.     Additionally, Alexander was never examined by any of the regular Jail nurses during his entire stay in the violent cell.  This is despite the fact that medical staff were aware of the conditions he was being subjected to, since they passed him his blood pressure medication each day through a slot in the cell door.

51.     The only health care provider to examine Alexander while he was in isolation was mental health professional Phlips.  She saw him one time on the morning of March 12, nearly two-and-a-half days after he was first transferred to the violent cell.

52.     Phlips's visit was cut short when she decided that Alexander was "too confused" to to answer her initial questions.  She noted that he could not "remember much of the past two days," but of course, there was not much to remember.  He had spent the last two days either sitting still

or pacing around his empty cell.  Moreover, it should not have been surprising that someone who had been subjected to more than two days of sleep deprivation, dehydration, and total isolation could appear somewhat "confused."  Isolation and sleep deprivation can each—on their own— cause anxiety, memory and concentration problems, and even hallucinations.  Even so, a reasonable mental health professional would have been alarmed at Alexander's state at taken steps to address it.

53.     However, Phlips took no action whatsoever.  Not only did she do nothing to alleviate the conditions that were causing Alexander's psychological deterioration, but she also completely failed to even report her observations to anyone.  Phlips is not a licensed doctor herself; her role is more of an "information gatherer."  As such, the standard of care requires her to report her findings to a doctor.  This is especially so when she has observed a patient with acute symptoms of psychological distress.  Her failure to do so is attributable to both her own negligence and Taft's failure to supervise or instruct her regarding this critical aspect of her role.

54.     Moreover, medical professionals caring for patients in a custodial environment (i.e., patients who are not fully able to act on their own volition) have a duty to report abuse or neglect committed against their patients by others.  For example, in the case of nursing homes, such reporting is actually required by law (see TEX. HEALTH & SAFETY CODE § 260A.002(a)).  Had Phlips made such a report to an appropriate authority (such as Dr. Taft, the Jail captain, or the Texas Rangers[1]), immediate intervention would have prevented the last three days of Alexander's abuse in isolation.  However, despite knowing exactly how the Jail was subjecting Alexander to severe abuse, Phlips reported the situation to no one.

---

[1] The Texas Rangers have statewide law enforcement authority over misconduct by public officials.

55.     Inexplicably, Phlips wrote that Alexander was in the violent cell because he was detoxing from alcohol.  This simply makes no sense; by the time Alexander was moved to the violent cell, he had already been in custody for over 48 hours.  Alexander was in fine health and not intoxicated when he was booked in, as documented by multiple medical professionals—including Phlips herself—at intake and over the course of Alexander's first two days at the Jail. Alexander had seen medical staff three times prior to being moved to the violent cell, including once only 40 minutes prior to his transfer to the violent cell, and none of those records (which are documented in Alexander's medical records as "Progress Notes") show any indication that Alexander appeared to be intoxicated or withdrawing from alcohol.  In reality, the false statement about alcohol withdrawal was part of an agreed attempt by Defendants to provide a pretextual reason for Alexander's solitary confinement.

56.     By the time Phlips saw him on the 12th, he had been in custody for more than 100 hours.  A person who did not appear intoxicated at book-in and for the first several days of his incarceration could not have consumed enough alcohol before his arrest to be detoxing more than four days later.

57.     Moreover, there is no documentation of any observation that would cause Jail staff to believe Alexander was suffering from alcohol withdrawal, such as seizures, unusual behavior, excessive sweating, or other observable symptoms.  Additionally, there is no documentation of his transfer, when Jail policy would have required that his transfer was documented, along with an explanation that it was due to alcohol withdrawal.

58.     One of the only documents that does exist and was created after Alexander's transfer to the violent cell is a second suicide screening form, which was filled out on the morning of March 10, presumably because Alexander had claimed to be suicidal.  Like the prior intake

forms, this form states that Alexander did not appear at that time to be under the influence of alcohol or drugs. The form answers "no" to the question "Do you think you will have withdrawal symptoms from stopping the use of medications or other substances (including alcohol or drugs) while you are in jail?" The form also answers "no" to questions about whether the inmate shows signs of depression, is displaying any unusual behavior, or is incoherent, disoriented, or showing signs of mental illness. Finally, a box for additional comments was left blank. All of these answers are completely inconsistent with a belief that Alexander was withdrawing from alcohol.

59.     Further, alcohol withdrawal is a serious and dangerous condition, especially for someone with high blood pressure, like Alexander. Had Jail staff really believed he was withdrawing from alcohol, not only would that have appeared somewhere in the Jail's nurses' notes, but the standard of care would have required medical staff to follow up by examining Alexander regularly during his five days in isolation. However, Alexander's medical records show that he was not seen at all by the Jail's regular medical staff after he complained of chest pains on the night of the 9th, and not once after being moved to the violent cell; this flatly contradicts any suggestion that Alexander began withdrawing from alcohol on the morning of the 10th and was subsequently treated for that.

60.     Instead, Alexander was left to rot in the violent cell until Dallas County transport officers arrived on the morning of March 15. When it was time for the transfer to Dallas County custody, Jail staff simply gave Alexander his clothes and left him to get dressed, completely unsupervised. This too is inconsistent with how an inmate who was either withdrawing from alcohol or genuinely believed to be suicidal would be treated. The Dallas County transport officers treated Alexander as a typical detainee without any special needs once he was in their custody.

61.     SHP staff, including LVN Linda Lacy, also participated in the coverup of Alexander's five-plus days of abuse.  Alexander's medical records from the Jail contain a Physician's Order with prescriptions for medication used to treat alcohol withdrawal.  This order was signed by Lacy, whose nursing license does not allow medical diagnosis nor the prescription of medicine.  It is apparent that this Physician's Order is not based on any legitimate diagnosis, for the same reasons discussed above as to why Phlips could not have believed on the 12th that Alexander was withdrawing from alcohol.

62.     Additionally, while the nurses did give Alexander his blood pressure medication daily, he never received several of the additional medications that were allegedly prescribed for alcohol withdrawal.[2]  Alexander's medical records do not contain a Medication Administration Record showing that any alcohol withdrawal medication was ever given to him.

63.     Second, there are no accompanying progress notes recording a nurse's observation or diagnosis that Alexander was suffering from alcohol withdrawal.  Normally, all encounters with an inmate/patient are documented through progress notes.

64.     Third, the only actual physician's signature on the order itself was made using a rubber stamp bearing the signature of Dr. Job Mongare.  It is clear that this signature was stamped, because it is identical to other instances of Mongare's signature appearing in Alexander's records.

65.     Mongare is the "Medical Director" for at least five separate facilities in which SHP provides medical care, including the Henderson County Jail.  However, he is the Jail's Medical Director in name only; he spends very little time (if any) at the facility itself and does not oversee the nurses' activities in any material way.  There is no record of any consultation with Mongare

---

[2] They did, apparently, give him daily doses of Dilantin, without telling Alexander what it was or why he needed it. When he was transferred to Dallas County, the medical officer there questioned why he was being given an anti-seizure medication when he did not suffer from seizures; Henderson County had communicated nothing to Dallas County about any treatment for alcohol withdrawal.

regarding this prescription.   Instead, it was unlawfully prescribed by Linda Lacy, a licensed vocational nurse (LVN) working for SHP at the Jail, who then simply stamped Mongare's name on the order without his authorization.

66.     This is consistent with how SHP operates in facilities it has contracts with across Texas: LVNs—nurses with the most easily-obtained licenses in Texas—make nearly every medical decision and have, for practical purposes, total autonomy in directing the inmates' medical care without any supervision from a doctor.  Not only are the nurses making assessments and planning treatment without consulting a physician, but neither Mongare nor any other physician reviews the nurses' decisions in any way.

67.     In addition to attempting to help with the coverup, Phlips, Lacy, and other SHP nurses at the Jail allowed Alexander—their patient—to remain isolated in horrifically unsanitary and unsafe conditions for days on end.  This is despite their direct observation of his deteriorating condition.  Such callous disregard is far short of the standard of care for correctional medical providers in ensuring inmates are not subjected to conditions that put their physical and mental health at serious risk.

68.     The standard of care would also call for these medical professionals to intervene when they observed Alexander's deteriorating condition.  However, none of them intervened, or took any other action whatsoever, despite the fact that Phlips saw him at least once on the 12th, and SHP staff saw Alexander every morning when distributing medication.  The medical professionals' participation in the coverup also indicates their knowledge of what Alexander was being subjected to.

69.     Like Phlips, SHP staff had a duty to both protect their patient from abuse and report any abuse that they were aware of.  Not only had Phlips and SHP staff personally observed the

conditions Alexander was being subjected to specifically, but they were also aware that officers at the Jail routinely placed inmates in the "violent cell" without justification and subjected them to the same conditions for purely punitive reasons.

70.     Also like Phlips, the role of an LVN such as Linda Lacy is that of an "information gatherer," since LVNs are not authorized to assess or diagnose patients' conditions.  However, neither Lacy nor any other member of SHP staff reported Alexander's deteriorating condition or the abuse he was suffering to the Jail medical director, the Jail captain, the Texas Rangers, a local hospital, or anyone else.  A timely report by SHP staff would more likely than not have prevented most of the abuse against Alexander, since they became aware of his conditions the morning after he was placed in the violent cell, at the latest.

71.     Texas Board of Nursing rules also support an allegation that the conduct of Taft, SHP, and their employees fell below the standard of care.  The following is not an exhaustive list, but for example, TEXAS ADMINISTRATIVE CODE § 217.211 requires that nurses:

- Implement measures to promote a safe environment for clients and others;

- Accurately and completely report and document the client's status;

- Report other nurses whose actions constitute abuse (although the correctional officers were not nurses, the standard of care is not limited to what is expressly stated in these rules and would have extended to reporting their abuse as well); and

- Institute appropriate nursing interventions that might be required to stabilize a client's condition and/or prevent complications.

72.     Additionally, LVNs such as Lacy and other SHP staff at the Jail must work "under the supervision of a registered nurse, advanced practice registered nurse, physician's assistant, physician, podiatrist, or dentist. Supervision is the process of directing, guiding, and influencing

17

the outcome of an individual's performance of an activity."  TEXAS ADMINISTRATIVE CODE §
217.211(2).  None of SHP's staff at the Jail were subject to any supervision as described in that
rule.

73.     After he was released from custody, Alexander continued to suffer tremendously
from the scars this ordeal had left on him.  The post-traumatic stress was so great that he had
difficulty sleeping and suffered from persistent nightmares.  Additionally, his feet had developed
infections from being exposed to urine, fecal matter, and generally unsanitary condition of the
floor of the violent cell.  Alexander was unable to work full time for more than six months after
he was released.

## V.     FIRST CAUSE OF ACTION: VIOLATION OF INMATE'S RIGHTS UNDER 42 U.S.C. § 1983

74.     All preceding paragraphs are incorporated here by reference.

75.     Defendants Jacob Parras and Tori Taylor each carried out extrajudicial,
unconstitutional punishment on Alexander, a pretrial detainee at the Henderson County Jail.
**Plaintiff does not assert any claims under § 1983 against Taft or SHP at this time, but
reserves the right to bring such claims in the future.**

76.     Specifically, Alexander was forced to endure more than five consecutive days of
isolated confinement, sleep deprivation, dehydration, dangerously unsanitary conditions, and
deprivation of access to even the most basic elements of personal hygiene.  Such abuse of a pretrial
detainee violates his clearly established rights under the due process clause of the Fourteenth
Amendment.

77.     Each individual Defendant was well aware of the serious danger they were placing
Alexander in when they intentionally subjected him to such treatment, yet they chose to subject

him to it anyway, for approximately 128 consecutive hours.  This abuse was done purely for retaliatory, punitive reasons, and had no reasonable penological purpose.

78.     Not only do all inmates have a right of access to basic human hygiene and other needs, but pretrial detainees such as Alexander have a right to be free from punishment of any kind.

79.     Therefore, the intentional punishment of Alexander and denial of basic human needs by Parras and Taylor violated his constitutional rights.

80.     The abuse described above caused severe mental and physical harm to Alexander.

## VI.     SECOND CAUSE OF ACTION: NEGLIGENCE/MEDICAL MALPRACTICE

81.     All preceding paragraphs are incorporated herein by reference.

82.     Taft and SHP, as well as their employees at the Jail, were contracted medical providers for the Henderson County Jail.  Therefore, they had duties to provide competent medical care to Ronnie Alexander while he was detained at the Jail.  Because of the custodial environment that Alexander was in, they had further duties to protect him from abuse by others and to report any such abuse as soon as they became aware of it.

83.     Employees of Taft and SHP breached their duties by abjectly failing to meet the standard of care in providing medical services to Alexander.  Specifically, they were aware that their patient, Alexander, was being subjected to a variety of inhumane and unlawful treatment that posed a serious danger to Alexander's physical and mental health.  Nonetheless, they allowed the treatment to continue, and even used their positions as medical providers to provide false justification for Alexander's isolated confinement.  They also completely failed to report the abuse or Alexander's observably deteriorating psychological condition to anyone, including their supervising doctors, the Jail captain, or the Texas Rangers.

84.     Jessica Phlips, an employee of Taft, personally observed Alexander's worsening mental health, which she was specifically responsible for caring for.  She took no action at all to remedy the situation, instead allowing Alexander to remain indefinitely in isolation and deprived of numerous basic human needs.  Phlips failed to report the abuse or Alexander's worsening mental health to anyone.  Furthermore, she participated in hiding the fact that Alexander's treatment was for purely punitive reasons, by falsely documenting that Alexander was in the violent cell for alcohol withdrawal.  She did this despite knowing that there had been no diagnosis of withdrawal by a physician or anyone else, nor were there any documented medical observations or tests of Alexander that would support such a diagnosis.  She also had seen Alexander prior to his isolation and documented then that he was not intoxicated or exhibiting any symptoms suggestive of alcohol withdrawal.  In fact, she had specifically noted that she had no concerns about his mental state.

85.     Linda Lacy, an employee of SHP, prescribed medication for Alexander that she knew he did not need, without a diagnosis or authorization by a physician.  This was done purely for the purpose of hiding the fact that Alexander had been placed in the violent cell and subjected to abuse for purely punitive reasons.  Like Phlips, Lacy had also seen Alexander prior to isolation, and had not observed any symptoms suggestive of alcohol withdrawal.  Lacy and/or other SHP employees also observed Alexander's deteriorating condition, as well as the inhumane conditions he was being subjected to, every morning when they distributed his medication.  Nonetheless, Lacy and the other SHP staff members failed to take any action whatsoever or report the abuse or Alexander's deteriorating condition to anyone.

86.     SHP and Taft are vicariously liable for the conduct of their employees, which was performed entirely within the course and scope of their employment.

87.     Alternatively, Taft and SHP are liable for providing medical services at the Jail that were fundamentally inadequate.  Namely, they were well aware that the actual practitioners in the Jail were not licensed or qualified to make patient assessments or treatment decisions, yet they implemented a system of medical care that required them to do just that.  Moreover, Taft and SHP completely failed to supervise these employees in any way or require that they communicate with company doctors (or any other doctor, for that matter) regarding serious medical situations. Indeed, they completely failed to supervise their employees in a way that would comply with the requirements of the Texas Board of Nursing.  Taft and SHP further failed to ensure their employees complied with their duty to protect inmate–patients from abuse and report such abuse as soon as they were aware of it.  Instead, they let their employees do as they pleased, including capitulating to or facilitating correctional officers' desire to exact unlawful punishment and abuse on detainees such as Alexander.

88.     Taft's and SHP's actions and/or inactions were the cause-in-fact and proximate cause of serious harms suffered by Alexander, namely, physical and mental suffering during and after five consecutive days of isolated confinement, sleep deprivation, dehydration, dangerously unsanitary conditions, and deprivation of access to even the most basic elements of personal hygiene.

89.     To whatever extent the procedural requirements of Chapter 74 of the Texas Civil Practice and Remedies Code apply to a suit filed in federal court, Plaintiff provided notice and medical release authorizations to Taft and SHP prior to filing suit, as per that Chapter.

## VII.    DAMAGES

90.     As a direct and proximate result of the above-described acts and omissions of Defendants, and/or individuals for whom the Defendants are legally responsible, Plaintiff has

suffered serious damages.  Accordingly, Plaintiff seeks to recover all actual, compensatory, and exemplary damages which have resulted from Defendants' above-described conduct.  These damages include, but are not necessarily limited to, the following:

    a) Physical suffering;

    b) Mental pain and anguish, both past and future;

    c) Lost wages;

    d) The cost of medical care and/or counseling necessitated by the harms done to him;

    e) Punitive damages against all Defendants; and

    f) Pre- and post-judgment interest in accordance with Texas law.

## VIII.   <u>JURY DEMAND</u>

91.   Plaintiff demands a trial by jury.


## IX.   <u>RELIEF REQUESTED</u>

For the reasons stated above, Plaintiff Ronnie Alexander requests that Defendants be summoned to appear and answer herein and that upon final trial or hearing, a judgment be entered in favor of the Plaintiff and against the Defendants as follows:

    a) Awarding Plaintiff actual damages in an amount that is within the jurisdictional limits of this Court;

    b) Awarding Plaintiff punitive or exemplary damages in an amount that is within the jurisdictional limits of this Court;

    c) Awarding Plaintiff reasonable and necessary attorney's fees and costs of court;

    d) Awarding Plaintiff pre-judgment interest at the highest rate permitted by law;

    e) Awarding Plaintiff post-judgment interest at the highest rate permitted by law; and

f) Awarding Plaintiff all such other and further relief, at law or in equity, to which he may show himself to be entitled.

Respectfully submitted,

By:   /s/ *Roger Topham*
        Roger Topham
        State Bar #24100557
13809 Research Blvd. Suite 500
Austin, Texas 78750
(512) 987-7818
rt@tophamlaw.com

Jeff Daniel Clark
State Bar #24109732
The Justice Foundry PLLC
550 Reserve Street Suite 190
Southlake, Texas 76092
(817) 953-8699
jdc@jdanielclark.com

**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I certify that this document was served on counsel for all parties through the Court's ECF system, in accordance with the Federal Rules of Civil Procedure, on April 15, 2022.

By:   /s/ *Roger Topham*
        Roger Topham