UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| RONNIE ALEXANDER, | § |
| | § |
| *Plaintiff*, | § |
| | § |
| v. | § Civil Action No. 3:22-cv-0395-x |
| | § |
| SOUTHERN HEALTH PARTNERS, | § |
| INC., et al., | § |
| | § |
| *Defendants.* | § |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Ronnie Alexander, while detained pretrial, told prison officials he was suicidal, so the officials put him in a bare-bones prison cell for five days. Unimpressed with that cell, he now sues Henderson County ("the County"), a private entity that provided medical care to inmates ("Southern Health"), a private entity that provided mental-health services to inmates and its owner ("the Taft Defendants"), and a handful of supervisory prison officials ("the Central Officers"). Each group of Defendants moves to dismiss. For the reasons below, the Court **GRANTS** Southern Health's motion to dismiss [Doc. 69], **GRANTS** the Central Officers' motion to dismiss [Doc. 74], **GRANTS** the County's motion to dismiss [Doc. 75], and **GRANTS** the Taft Defendants' motion to dismiss [Doc. 80].

1

## I.  Background

Alexander, a pretrial detainee at the Henderson County Jail, told prison officials he was suicidal.  That was a lie.  Regardless, the officials took Alexander at his word and placed him in a "violent cell" for five days.[1]  To prevent suicides, that cell was somewhat barren, containing only a concrete slab for a bed and a drain in the middle of the floor.  Alexander primarily complains concerning five facets of his time in that cell.

First, because the cell lacked a toilet or toilet paper, Alexander had to defecate in a drainage grate and force feces through it with a paper cup.  Sans a sink, the cell and, ultimately, his body became unsanitary.

Second, lights constantly illuminated the cell, so Alexander struggled to sleep and experienced disorientation.  Further, officials provided Alexander only with a "suicide blanket" as bedding.[2]

Third, the officials only gave Alexander twenty-four ounces of liquids each day.  Although Alexander repeatedly requested water, the officials denied those requests, causing him to become dehydrated.

Fourth, Alexander complains about the officials' statements.  For instance, before placing him in the violent cell, one jeered, "[y]ou really fucked up now, bitch."[3]

---

[1] Doc. 62 at 2.  The Court recites these facts as enunciated in Alexander's complaint, assuming, only for purposes of this order, they are true.  *See Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).

[2] *Id.* at 9.

[3] *Id.* at 8.

One paraded a police dog by his cell and threatened to sic it on Alexander. One threatened to decapitate Alexander with barbed wire. One said, "Ronnie Alexander, you are not leaving this facility alive."[4]

Fifth, Alexander complains about medical care. Specifically, Philip R. Taft, Psy.D & Associates PLLC ("Taft PLLC") employed Jessica Phlips to evaluate inmates' mental health. Phlips failed to review Alexander's records, decided he was too confused to answer questions, and chalked up his mental state to alcohol withdrawal without mentioning his conditions of confinement. Further, Southern Health Partners Inc. ("Southern Health") employed a variety of nurses at the jail. Those nurses never inquired into his wellbeing.

Alexander sues four groups of Defendants. First, he sues Southern Health, a company that contracts with the jail to provide medical care to inmates. Second, he sues the Central Officers, a group consisting of eight supervisory correctional officers—Nathaniel Patterson, Taylor Caldwell, Morgan Fain, Noah Kreie, William Trussell, Dora Martinez, Jordan Jackson, and Melissa Harmon (collectively, the "Central Officers")—each of whom was on duty during Alexander's stay in the violent cell. Third, he sues the County. Fourth, he sues Philip Taft and Taft's company, Taft PLLC (collectively, "the Taft Defendants"), which employed Jessica Phlips, the mental-health worker who examined Alexander.

Each group of Defendants now moves to dismiss.

---

[4] *Id.* at 10.

## II. Legal Standard

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6). Under Rule 12(b)(6), the Court evaluates the pleadings by "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff."[5] To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[6] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[7]

## III.  Analysis

Four groups of Defendants move to dismiss: (A) Southern Health, (B) the Central Officers, (C) the County, and (D) the Taft Defendants.  The Court considers each motion in turn.

### A.  Southern Health

Alexander brings a medical-negligence claim against Southern Health.[8]  "For medical negligence actions, [a] plaintiff must prove: (1) a duty by the physician to act according to a certain standard; (2) a breach of the applicable standard of care; (3) injury or harm to . . . [the] plaintiff; and (4) a causal connection between the

---

[5] *Stokes*, 498 F.3d at 484.

[6] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

[7] *Id.*

[8] Doc. 62 at 45; *see also id.* at 39 ("Plaintiff does not assert any claims under § 1983 against [Southern Health] at this time, but reserves the right to add such claims in the future.").

breach of the applicable standard of care and the injury or harm."[9]  On that first factor—duty—a plaintiff must allege "how a reasonably careful and prudent physician would have acted under the same or similar circumstances."[10]  "A physician is not a guarantor of a cure, and negligence is not imputed from an unsatisfactory outcome."[11]  Instead, there's a "presumption that the health-care provider has discharged his duty of care."[12]

Alexander asserts that Southern Health's nurses could see his cell "from the nurses' station," and, consequently, that they had a duty to observe his "lack of access to drinking water," observe his "mental state and general wellbeing," and "inquire . . . as to his wellbeing."[13]  Alexander attempts to manufacture such a duty from three sources.

First, he contends that medical staff at jails have a generalized "duty to protect inmates from harm."[14]  That's wrong.  Although Bureau of Prison ("BOP") officials must "provide suitable quarters and provide for the safekeeping, care, and

---

[9] *Nichols v. United States*, No. 21-50368, 2022 WL 989467, at *4 (5th Cir. Apr. 1, 2022) (per curiam).  Although Alexander only asserts a simple-negligence claim, the medical-negligence standard applies—regardless of how a plaintiff styles his claim—when a claim involves "health-care-related negligence claims."  *Id.*  Because Alexander's negligence claims relate to health care, the medical-negligence standard applies.

[10] *Jenkins v. United States*, No. 4:18-CV-918-P, 2019 WL 6878174, at *3 (N.D. Tex. Dec. 17, 2019) (Pittman, J.), *aff'd*, No. 20-10041, 2021 WL 3854789 (5th Cir. Aug. 27, 2021) (per curiam).

[11] *Id.*

[12] *Id.*

[13] Doc. 62 at 45–46.

[14] Doc. 71 at 6.

5

subsistence of" inmates,[15] "the general duty enunciated [for BOP officials] does not set forth the standard of care for a particular medical-negligence claim."[16]

Second, Alexander asserts that Southern Health's "own [] policies" demonstrate "the duty to protect inmate-patients from harm, and specifically, the potential harm of solitary confinement."[17] And those policies require "an observation schedule," "[p]rogress notes," and the frequent taking of "[v]ital signs."[18] But "[i]n Texas, a hospital's internal policies . . . alone do not determine the governing standard of care."[19] Although such policies may provide "evidence of the standard of care," a hospital may "maintain a higher standard of care than the prevailing community standard."[20]

Third, Alexander cites—for the first time in his briefing—the National Commission on Correctional Health Care's ("NCCHC") standards for segregated inmates. Those standards say that a medical professional must initially "review[] the inmate's health record," "monitor[] [the inmate] 3 days a week," document any

---

[15] 18 U.S.C. § 4042(a)(2).

[16] *Thomas v. United States*, No. 4:12-CV-005-Y, 2013 WL 12092515, at *6 (N.D. Tex. July 9, 2013) (Means, J.), *aff'd*, 566 F. App'x 348 (5th Cir. 2014) (per curiam); *accord Hannah v. United States*, No. 4:04-CV-643-Y, 2006 WL 2583190, at *5 (N.D. Tex. Sept. 1, 2006) (Means, J.) ("[T]he standards enunciated in 18 U.S.C. § 4042 do not set forth the standard of care for a particular medical negligence claim[.]"), *aff'd*, 523 F.3d 597 (5th Cir. 2008); *Lee v. Bureau of Prisons*, No. 4:10-CV-033-Y, 2012 WL 1867345, at *4 (N.D. Tex. May 23, 2012) (Means, J.) (same); *Masters v. United States*, No. 4:06-CV-502-Y, 2008 WL 4146020, at *7 (N.D. Tex. Sept. 9, 2008) (Means, J.) (same).

[17] Doc. 71 at 7.

[18] *Id.*

[19] *Quijano v. United States*, 325 F.3d 564, 568 (5th Cir. 2003).

[20] *Id.*

6

observation, and "inform custody officials of inmates who are physically or psychologically deteriorating."[21]

But Alexander doesn't explain why those policies create the appropriate standard of care or, for that matter, how Southern Health's employees failed to comply with those policies.[22]  For instance, far from failing to monitor, Alexander alleges that medical staff "passed him his medication each day."[23]  Likewise, instead of failing to review Alexander's health records during intake, "at intake," Southern Health's staff discovered his history of high blood pressure and prescribed a medication.[24]  And Alexander acknowledges that, on the occasions he visited with medical staff, "[p]rogress notes [were] made by medical staff."[25]

Accordingly, the Court **DISIMSSES WITHOUT PREJUDICE** Alexander's claim against Southern Health.  Alexander may file an amended complaint within 28 days alleging the appropriate standard of care and how Southern Health violated that standard.

---

[21] Doc. 71 at 16.

[22] Although Alexander's complaint does cite NCCHC policies, it does so only in the context of mental health professionals reporting mistreatment.  Doc. 62 at 24–25.

[23] *Id.* at 15.  Alexander complains that the medical staff didn't "inquire[] into his wellbeing," but he doesn't cite anything suggesting that "monitoring" requires a medical official to ask Alexander how he's doing.  *Id.*  And although Alexander contends that no nurse ever checked his vitals, he cites to dubious evidence that nurses may have checked his blood pressure.  *Id.* at 15 n.5.  A failure to check vitals and blood pressure may flout the NCCHC standards, but, because Alexander neither cited nor applied those standards in his complaint, he doesn't state a claim.  Alexander may elaborate on this issue in his amended complaint.

[24] *Id.* at 5.

[25] *Id.* at 6.

## B. Central Officers

The Central Officers raise two issues.  First, they contend that the complaint "fails to specify the personal involvement of each" Central Officer.[26]  Because "supervisory officials may not be found vicariously liable . . . under 1983,"[27] a plaintiff must allege that each supervisory official was "personally involved in the deprivation of his rights."[28]  And a plaintiff can't, in conclusory fashion, assert that supervisory officials collectively violated his rights.  When a plaintiff "fails to distinguish the actions of each named defendant," the plaintiff engages in "quintessential shotgun pleading, which could properly be disregarded."[29]  Shotgun pleading violates Federal Rule of Civil Procedure 8's "notice pleading standard by failing . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."[30]

Here, Alexander groups the Central Officers together, averring that "the [Central Officer] Defendants participated in [] verbal abuse" against him and that

---

[26] Doc. 74 at 5.

[27] *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452 (5th Cir. 1994) (en banc).

[28] *Thomas v. Humfield*, Nos. 92-2177, 92-2719, 1994 WL 442484, at *5 (5th Cir. 1994).

[29] *Bell v. Wells Fargo Bank, N.A.*, No. 4:14-CV-388-Y, 2017 WL 6761770, at *3 (N.D. Tex. Oct. 13, 2017) (Means, J.) (cleaned up); *see also Curry v. Lubrizol Corp.*, No. 4:22-CV-03735, 2022 WL 17811395, at *1 (S.D. Tex. Dec. 19, 2022) (recognizing that a plaintiff engaged in "vague 'shotgun pleading'" when he "insufficiently specified which defendants committed which tortious acts"); *Davis v. City of Alvarado*, No. 19-CV-463-K-BK, 2019 WL 6896878, at *4 n.2 (N.D. Tex. Dec. 3, 2019) (Toliver, M.J.) (recognizing that "shotgun pleading must be disregarded where it uses blanket terms to address all defendants collectively or asserts multiple claims against multiple defendants without specifying which defendants are responsible for which acts" (cleaned up)), *report and recommendation adopted*, No. 3:19-CV-0463-K, 2019 WL 6894686 (N.D. Tex. Dec. 18, 2019) (Kinkeade, J.), *aff'd*, 835 F. App'x 714 (5th Cir. 2020) (per curiam).

[30] *Alexander v. Hall*, No. 4:20-CV-21-DMB-JMV, 2021 WL 800840, at *3 (N.D. Miss. Mar. 2, 2021) (cleaned up).

"[e]ach of the [Central Officer] Defendants specifically denied Alexander's repeated requests for water, toilet paper, and an opportunity to shower or wash his hands."[31] Without delineating the actions of each Central Officer, Alexander fails to provide each Central Officer with notice of the grounds upon which the claims against him rest. For instance, did Central Officer Nathaniel Patterson deny Alexander's request for a shower or did Patterson deny Alexander's request to wash his hands? On what day did Patterson deny those requests? All of that could be relevant to a qualified-immunity analysis, but none of that is clear from Alexander's complaint. Accordingly, the Central Officers cannot properly defend themselves against those allegations.

Alexander counters that more detail is impossible because "[n]o one in the violent cell would be able to reliably read names on uniforms through" the small window in the cell.[32] But shotgun pleading isn't the solution. Instead, if an inmate has trouble identifying a jailer, the inmate may name a John Doe defendant, and a court can grant "discovery[] . . . to learn the defendant's identity."[33] But the Court cannot assume a supervisory official's involvement based merely on his position.

---

[31] Doc. 62 at 10–11.

[32] Doc. 81 at 10.

[33] *Williams v. Certain Individual Employees of Tex. Dep't of Criminal Justice-Institutional Div. at Jester III Unit*, 480 F. App'x 251, 258 (5th Cir. 2010) (per curiam); *Murphy v. Kellar*, 950 F.2d 290, 293 (5th Cir. 1992) ("Whether or not Murphy can adequately identify the prison officers who allegedly assaulted him can only be determined conclusively if Murphy is given the opportunity to conduct discovery.").

Second, the Central Officers contend they are entitled to qualified immunity. Courts determine whether an official is entitled to qualified immunity based on a two-step inquiry: (1) "whether the officer's alleged conduct has violated a federal right," and (2) "whether the right in question was clearly established at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct."[34]  On that first prong, Alexander appears to allege a due-process violation based on his conditions of pre-trial confinement.[35]  To make out such a claim, an inmate must allege that the deprivation at issue is "objectively, sufficiently serious" such that it "result[s] in the denial of the minimal civilized measure of life's necessities" and that the prison official has "a sufficiently culpable state of mind."[36]  That state of mind is called "deliberate indifference," and "[t]o establish deliberate indifference, the prisoner must show that the defendants (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed."[37]

---

[34] *Spikes v. McVea*, 8 F.4th 428, 434–35 (5th Cir. 2021) (cleaned up), *on reh'g*, 12 F.4th 833 (5th Cir. 2021), *reh'g denied*, No. 19-30019, 2021 WL 4978586 (5th Cir. Oct. 13, 2021).

[35] *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) ("The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment, and, with a relatively limited reach, from substantive due process. The constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." (citation omitted)).

[36] *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999) (cleaned up).

[37] *Id.* (cleaned up).

10

The parties' paltry briefing on qualified immunity provides little help.  For instance, it seems clear that Alexander's claim that the Central Officers verbally abused him will fall short because "[m]ere allegations of verbal abuse do not present actionable claims under § 1983."[38]  But on deliberate indifference, Alexander only asserts in conclusory fashion that "the [Central Officer] Defendants were deliberately indifferent to his rights."[39]  And the parties don't even attempt to argue the second prong of qualified immunity.  Without more, the Court will not opine on the merits of any qualified-immunity argument until seeing Alexander's best complaint and better motion to dismiss briefing on qualified immunity.

The Court **DISMISSES WITHOUT PREJUDICE** Alexander's claims against the Central Officers.  Alexander may file an amended complaint within 28 days specifying the particular actions of each Central Officer and adding any facts that are relevant to the qualified-immunity analysis for the Central Officers.

### C. The County

To allege that a county is liable for constitutional violations under Section 1983, a plaintiff must allege "(1) an official policy (or custom), (2) that a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)."[40]  The County provides two arguments as to why Alexander fails to meet his pleading burden on this claim.

---

[38] *Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993) (cleaned up).

[39] Doc. 81 at 11.

[40] *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022) (cleaned up).

First, the County contends that the County Sheriff constitutes the relevant policymaker and that Alexander's complaint "contains no allegations regarding an unconstitutional policy implemented by [the] Henderson County Sheriff [] or any awareness by [the] Sheriff [] of the complaints raised by the Plaintiff."[41]  But "courts should not grant motions to dismiss for failing to plead a specific identity" of a policymaker.[42]

Second, the County claims that "[t]here is no pattern of sufficiently numerous prior incidents . . . to constitute a policy, custom[,] or practice or to draw a reasonable inference that the practice was so widespread that [the] Sheriff [] had actual or constructive knowledge of such policy."[43]  Alexander alleges that the unconstitutional conditions in the violent cell are "so widespread" that "the county policymaker must have had at least constructive knowledge of it."[44]  And Alexander cites complaints from "eight other individuals" between 2019 and 2022 about similar conditions in the violent cell.[45]

"Sufficiently numerous prior" constitutional violations can prove a policymaker's constructive knowledge, whereas "[i]solated instances . . . are inadequate to prove knowledge and acquiescence by policymakers."[46]  Prior incidents

---

[41] Doc. 75 at 8.

[42] *Pena v. City of Rio Grande City*, 879 F.3d 613, 622–23 (5th Cir. 2018) (cleaned up).

[43] Doc. 75 at 9.

[44] Doc. 62 at 42.  Alexander's failure to identify the Sheriff isn't dispositive.  *Pena*, 879 F.3d at 622–23.

[45] Doc. 82 at 15.

[46] *McConney v. City of Hous.*, 863 F.2d 1180, 1184 (5th Cir. 1989).

can establish constructive knowledge only when they "have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [public] employees."[47]

What's the dividing line between numerous and not?  That's a fact-intensive question.  For instance, in a four-year timespan, "[e]leven incidents . . . cannot support a pattern of illegality *in one of the Nation's largest cities and police forces*."[48]  So it's clear that courts can't myopically seek any particular number of prior incidents.  Instead, courts need to determine the size of the governmental entity at issue and the number of people potentially subject to the alleged misconduct.  Here, Alexander provides no such information.  How many inmates does the jail house? How many inmates have cycled through that jail in the past four years?  How many have spent time in the violent cell?  Alexander remains mum.  Sans such information, the Court can't determine whether eight incidents are sufficiently numerous to attribute constructive knowledge to the relevant policymaker.[49]  In short, "the sparse

---

[47] *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (cleaned up).

[48] *Pineda v. City of Hous.*, 291 F.3d 325, 329 (5th Cir. 2002) (emphasis added); *see also Flanagan v. City of Dall.*, 48 F. Supp. 3d 941, 954 (N.D. Tex. 2014) (Lynn, J.) ("[T]he 11 sample cases that the *Pineda* court looked at spanned a four-year period."); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (concluding that "the 27 complaints on which Peterson relies were insufficient to establish a pattern of excessive force").

[49] *Cf. Peterson*, 588 F.3d at 851 ("[T]he record does not indicate the size of the Fort Worth Police Department or how many arrests were made by the department between 2002 and 2005.  We have previously indicated that the size of a police department may be relevant to determining whether a series of incidents can be called a pattern.").

facts alleged by [Alexander] fail to plausibly show Defendant [Henderson County] implemented an official policy" of constitutional violation in the violent cell.[50]

Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Alexander's claims against the County.  Alexander may file an amended complaint within 28 days alleging the information specified above.

### D. Taft Defendants

Alexander sues the Taft Defendants based on (1) Section 1983 and (2) medical negligence.  The Court considers each in turn.

### 1.  Section 1983

At the outset, the Taft Defendants assert that, as private parties, they don't constitute "state actor[s] under Section 1983."[51]  That's wrong.  The Taft Defendants admit that "Dr. Taft contracted with Henderson County to provide 30 hours a week of mental health services to Henderson County Jail."[52]  And it's well established that "[a] private doctor under contract with a state prison to provide medical care to prisoners is considered a state actor because his action in providing medical care to prisoners is fairly attributable to the state."[53]  So Taft can be liable under Section

---

[50] *Weisshaus v. Teichelman*, No. 2:22-CV-035-Z-BR, 2022 WL 1689443, at *4 (N.D. Tex. May 25, 2022) (Kacsmaryk, J.) ("Plaintiff does not include information as to the size of Defendant's law enforcement division or how many arrests in total occurred during the eight-year period in which the alleged 21 alleged violations occurred.  Even more, Plaintiff does not include specific facts as to the ultimate resolution of any of the cited examples." (citations omitted)).

[51] Doc. 80 at 10.

[52] *Id.* at 13.

[53] *Bishop v. Karney*, 408 F. App'x 846, 848 (5th Cir. 2011) (per curiam) (concluding that "a licensed psychiatrist who worked for the Texas Department of Criminal Justice under a personal services contract with the Texas Tech University Health Sciences Center" was a state actor); *see also West v. Atkins*, 487 U.S. 42, 54 (1988) ("[A] physician employed by North Carolina to provide medical

14

1983 just like an individual jailer. But what about Taft PLLC? Some courts have held that "[a] private company . . . that has been hired to run the medical department at a [] jail is treated as a municipal or local governmental entity for the purposes of 42 U.S.C. § 1983, and, therefore, claims against such a company are analyzed as '*Monell*' claims."[54] Because the parties appear to agree on this point, the Court assumes, *arguendo*, that a private company can be subject to *Monell* liability.[55] The Court considers Alexander's Section 1983 claims against (A) Taft and (B) Taft PLLC.

### A. Taft

Alexander asserts that Taft is "liable in his individual capacity for the 'act or omission' of ignoring all of his patients at the Jail—including Alexander—[and] instead delegating all of his 'doctor work' to an unlicensed, unqualified individual."[56] "[W]here the claim is based on an episodic act or omission, . . . the case focuses on whether the official breached his constitutional duty to tend to the basic human needs of persons in his charge."[57] In "act or omission" cases, "intent to cause harm is not

---

services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury.").

[54] *Guillotte v. Knowlin*, No. 21-1422, 2021 WL 7632004, at *2 (E.D. La. Dec. 7, 2021), *report and recommendation adopted*, No. 21-1422, 2022 WL 355509 (E.D. La. Feb. 7, 2022); *see also Moore*, 41 F.4th at 509 (analyzing a plaintiff's claim that "the Corporate Defendants . . . are all *directly* liable under *Monell*"); *Olivas v. Corr. Corp. of Am.*, 215 F. App'x 332, 333 (5th Cir. 2007) (per curiam) (concluding that a private corporation "may not be held liable on a theory of respondeat superior" because *Monell* dictates the analysis).

[55] See Doc. 80 at 14 (analyzing Alexander's claims under a municipal-liability framework); Doc. 83 at 18 ("Taft's policies (or those of his business entity, Taft & Associates) can be analyzed in the same way a municipality's policies would.").

[56] Doc. 83 at 18.

[57] *Rodriguez v. S. Health Partners, Inc.*, No. 3:20-CV-0045-D, 2020 WL 2928486, at *11 (N.D. Tex. June 3, 2020) (Fitzwater, J.).

presumed."[58]  Instead, "[t]o state an episodic act or omission claim . . . , [a plaintiff] must allege that [the defendant] violated [the plaintiff's] right to medical treatment with subjective deliberate indifference."[59]  "[D]eliberate indifference is an extremely high standard to meet and requires a showing that the official[] refused to treat the pretrial detainee, ignored h[is] complaints, intentionally treated h[im] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[60]

In his meager treatment of this topic, Alexander never asserts that Taft was deliberately indifferent.  He doesn't allege that Taft intentionally ignored his complaints, treated him incorrectly, or refused to treat him.  In fact, he doesn't even allege that Taft knew about him during the relevant time period.  Absent such allegations, Alexander can't establish deliberate indifference *vis-à-vis* Taft.

### B.  Taft PLLC

Alexander asserts two theories of liability against Taft PLLC.  First, Alexander says that "Taft PLLC should be [vicariously] liable for the constitutional violations of Jessica Phlips."[61]  That's wrong.  "Section 1983 does not create supervisory or *respondeat superior* liability."[62]  So neither Taft PLLC nor, for that matter, Taft himself can be vicariously liable on Alexander's Section 1983 claims.

---

[58] *Id.* at *12.

[59] *Id.*

[60] *Id.* (cleaned up).

[61] Doc. 101 at 4.

[62] *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002); *accord Olivas*, 215 F. App'x at 333 (recognizing that companies that contract to provide medical care to inmates "may not be held liable

16

Second, Alexander asserts a claim of "municipal liability against" Taft PLLC because "the County delegated policymaking authority over mental health care at its jail to the Taft Defendants."[63]  "A private company . . . that has been hired to run the medical department at a [] jail is treated as a municipal or local governmental entity for the purposes of 42 U.S.C. § 1983, and, therefore, claims against such a company are analyzed as *Monell* claims."[64]  "Proof of municipal liability sufficient to satisfy *Monell* requires: (1) an official policy (or custom), of which (2) a policy maker can be

---

on a theory of respondeat superior").  Alexander notes the Fifth Circuit's recent comment that it "ha[s], apparently, never squarely decided whether plaintiffs can hold *private* defendants vicariously liable under § 1983."  *Moore*, 41 F.4th at 509.  But Alexander ignores the mountain of caselaw holding that no entity—private or otherwise—is subject to *respondeat-superior* liability under Section 1983.  *See, e.g.*, *Watkins v. Cornell Companies, Inc.*, No. 3:11-CV-260-M-BN, 2013 WL 1914713, at *6 (N.D. Tex. Mar. 15, 2013) (Horan, M.J.) ("The law is well-established that respondeat superior liability is unavailable in Section 1983 suits."), *report and recommendation adopted*, No. 3:11-CV-260-M-BN, 2013 WL 1926375 (N.D. Tex. May 8, 2013) (Lynn, J.); *Duffie v. Wichita Cnty.*, No. 7:13-CV-0032-O, 2014 WL 5796837, at *10 (N.D. Tex. Nov. 6, 2014) (O'Connor, J.) ("Section 1983 does not allow a municipality, or a corporation performing a municipal function, to be held vicariously liable for its officers' actions on a theory of respondeat superior."); *Guillory v. Transwood Carriers*, No. 3:11-CV-1477-D, 2013 WL 1759279, at *2 (N.D. Tex. Apr. 24, 2013) (Fitzwater, J.) ("[A]n employer cannot be held liable solely because it employs a tortfeasor—or, in other words . . . cannot be held liable under § 1983 on a *respondeat superior* theory.  Although *Monell* stated this rule in the context of municipal government liability, a substantial majority of lower courts—and each circuit to address the issue— have found that *Monell* is equally applicable to private entities that have been sued under § 1983." (cleaned up)).  The Court finds no reason to vary from this rule.

[63] Doc. 101 at 5.  Alexander also appears to assert a municipal liability claim against Taft himself.  But he provides no authority suggesting that an individual can be subject to *Monell* liability.  Regardless, even supposing Taft could incur *Monell* liability, that claim would fail for the reasons given below.

[64] *Guillotte*, 2021 WL 7632004, at *2.  Because the Taft Defendants don't appear to contest the issue, the Court assumes, *arguendo*, that private entities providing medical care to inmates may be exposed to municipal liability.  *See Olivas v. Corr. Corp. of Am.*, 408 F. Supp. 2d 251, 254–55 (N.D. Tex. 2006) (Bleil, M.J.) ("The standards applicable to determining liability under § 1983 against a municipal corporation are applicable to determining the liability of a private corporation performing a government function."), *aff'd*, 215 F. App'x 332 (5th Cir. 2007) (per curiam).

charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)."[65]

On that third factor, the "moving force" causation requirement is "rigorous and stringent."[66]  A policy is a moving force of a constitutional violation only if there's "a direct causal link between the municipal action and the deprivation of federal rights."[67]  But-for causation is not enough.[68]  And courts are careful not to "dilute[]" those requirements because, "where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability."[69]

Here, Alexander alleges that "Taft [] completely failed to train or supervise [Phlips] in any way" and that Taft himself "took no steps whatsoever to . . . prevent abuse of inmates by correctional staff."[70]  Consequently, the argument goes, Taft PLLC implemented a policy of leaving "no one at the Jail . . . qualified to assess potentially suicidal inmates."[71]  That left jailers "with unchecked discretion to subject inmates to harsh restrictions under the guise of 'suicide precautions.'"[72]  In short,

---

[65] *Pineda*, 291 F.3d at 328.

[66] *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998) (cleaned up).

[67] *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

[68] *Waller v. Hoeppner*, No. 21-10129, 2022 WL 4494111, at *4 (5th Cir. Sept. 27, 2022) (per curiam) ("[T]hese policies may be 'but for' causes, but they are not the moving force behind Hoeppner's use of force." (cleaned up)), *cert. denied*, 143 S. Ct. 1058 (2023).

[69] *Piotrowski v. City of Hous.*, 237 F.3d 567, 580 (5th Cir. 2001) (cleaned up).

[70] Doc. 83 at 6, 24.

[71] *Id.* at 23.

[72] *Id.*

18

Alexander creates a convoluted chain of causation: With a constitutionally adequate policy, Phlips might have determined—contrary to Alexander's own position—that Alexander was not suicidal but was instead suffering from his conditions of confinement. Next, she could have communicated that message to the jailers. Next, the jailers could have released Alexander from the violent cell.

That's too attenuated. Taft's policies aren't the moving force behind the alleged deprivation of constitutional rights that Alexander alleges because there's no "direct causal link between [Taft's] action and the deprivation of federal rights."[73] Tellingly, Phlips didn't cause Alexander to be put into the violent cell in the first place. For instance, Phlips examined Alexander hours before he entered the violent cell and averred that "she had no concerns as to Alexander's mental status."[74] So Alexander certainly can contend that Phlips could have done something to get him out of the violent cell. But he can't credibly posit that Phlips's actions were the "moving force" behind his incarceration in the violent cell.

## 2. Medical Negligence

Alexander brings a negligence claim against the Taft Defendants. "For medical negligence actions, plaintiff must prove: (1) a duty by the physician to act according to a certain standard; (2) a breach of the applicable standard of care;

---

[73] *Brown*, 520 U.S. at 404; *see also Waller*, 2022 WL 4494111, at *4 ("This means that a city policy or custom had to directly influence the use of excessive force during the crucial forty-four seconds of the shooting. Plaintiffs allege policies or customs that relate to the series of events that precede that time frame."), *cert. denied*, 143 S. Ct. 1058 (2023). For the same reasons, Alexander's argument that the County is liable for Taft's actions fails.

[74] Doc. 62 at 6 (cleaned up).

(3) injury or harm to . . . plaintiff; and (4) a causal connection between the breach of the applicable standard of care and the injury or harm."[75]   Unlike Section 1983 claims, with medical-negligence claims, a healthcare employer can be "vicariously liable for its employee's negligent acts if those acts are within the course and scope of his employment."[76]

Alexander's medical-negligence claim flounders on that fourth element—causation.   Concerning causation, the complaint alleges in conclusory fashion only that "Taft's actions and/or inactions were the cause-in-fact and proximate cause of serious harms suffered by Alexander, namely, physical and mental suffering during and after five consecutive days of isolated confinement."[77]   But that conclusory statement leaves much to be desired.   For instance, Alexander doesn't provide any facts explaining whether Phlips or Taft had power over Alexander's conditions of confinement.   Could Taft have ordered jailers to remove Alexander from the violent cell?   Could Phlips have ordered that Alexander receive water or toilet paper?   Alexander doesn't say.   Without any allegations concerning the Taft Defendants' power to remedy Alexander's physical and mental suffering, Alexander cannot

---

[75] *Nichols v. United States*, No. 21-50368, 2022 WL 989467, at *4 (5th Cir. Apr. 1, 2022) (cleaned up).   Although Alexander asserts that he brings a simple negligence claim, the test for whether a claim involves "medical" negligence is whether the plaintiff brings "health-care-related negligence claims."   *Id.*   Because Alexander's negligence claims are related to healthcare, the medical negligence standard applies.

[76] *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018).

[77] Doc. 62 at 44.

sustain a medical-negligence claim against them.

Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Alexander's claims against the Taft Defendants. Alexander may file an amended complaint within 28 days alleging facts showing the causal connection between the Taft Defendants' actions and his injuries.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' motions to dismiss [Docs. 69, 74, 75, 80] and **DISMISSES WITHOUT PREJUDICE** Alexander's complaint. Alexander may file an amended complaint within 28 days making only the changes specified above. Because this is Alexander's fourth bite at the apple, this will be his last opportunity to amend his complaint.

**IT IS SO ORDERED** this 12th day of June, 2023.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE