IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RONNIE ALEXANDER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| SOUTHERN HEALTH PARTNERS, INC.; | § | CIVIL ACTION NO. 3:22-cv-395 |
| PHILIP TAFT, individually; PHILIP R. | § | |
| TAFT, PSY.D & ASSOCIATES, PLLC; | § | |
| HENDERSON COUNTY, TEXAS; | § | |
| NATHANIEL PATTERSON; TAYLOR | § | |
| CALDWELL; MORGAN FAIN; NOAH | § | |
| KREIE; WILLIAM TRUSSELL; DORA | § | |
| MARTINEZ; and MELISSA HARMON; | § | |
| | § | |
| *Defendants*. | § | |

---

## PLAINTIFF'S THIRD AMENDED COMPLAINT

---

Roger Topham
State Bar #24100557
13809 Research Blvd. Suite 500
Austin, Texas 78750
(512) 987-7818
rt@tophamlaw.com

Jeff Daniel Clark
State Bar #24109732
The Justice Foundry PLLC
550 Reserve Street Suite 190
Southlake, Texas 76092
(817) 953-8699
jdc@jdanielclark.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................................1

II.    PARTIES ...................................................................................................................................3

III.    JURISDICTION AND VENUE ..............................................................................................4

IV.    FACTUAL ALLEGATIONS ..................................................................................................4

    *Each of the CO Defendants Denied Basic Human Needs*.........................................................10

    *Jessica Phlips's "Assessment" of Ronnie Alexander* ............................................................17

    *The County and Taft Willfully Deprived All Inmates at the Jail of Access to Any Mental Health Care*........19

    *The Jail's Express Policies Regarding Suicide Prevention Are Facially Unlawful* ...............28

    *Medical Staff Completely Failed to Monitor Alexander's Health* ..........................................30

    *The Jail Maintained a Custom or Practice of Using the Violent Cell for Punishment* ...........34

    *Jessica Phlips Was Aware of Abuse Occurring in the Violent Cell* ........................................39

V.    FIRST CAUSE OF ACTION: VIOLATION OF INMATE'S RIGHTS UNDER 42 U.S.C. § 1983................43

    *The Taft Defendants*.................................................................................................................43

    *Henderson County* ....................................................................................................................45

    *The CO Defendants* ..................................................................................................................46

VI.    SECOND CAUSE OF ACTION: NEGLIGENCE ..............................................................47

    *The Taft Defendants*.................................................................................................................47

    *Taft: Gross Negligence* ............................................................................................................48

    *SHP*............................................................................................................................................49

VII.    DAMAGES ............................................................................................................................50

VIII.    JURY DEMAND ...................................................................................................................50

IX.    RELIEF REQUESTED .........................................................................................................51

Plaintiff Ronnie Alexander files this Third Amended Complaint pursuant to the Court's order of June 12, 2023 [Doc. 112] against Southern Health Partners, Inc., ("SHP"); Philip Taft in his individual capacity; Philip R. Taft, Psy.D & Associates PLLC (collectively, "the Taft Defendants" or simply "Taft"); Henderson County, Texas; and Henderson County Correctional Officers Nathaniel Patterson, Taylor Caldwell, Morgan Fain, Noah Kreie, William Trussell, Dora Martinez, and Melissa Harmon (collectively, the "CO Defendants").  Plaintiff would respectfully show the Court the following:

## I.   <u>INTRODUCTION</u>

1.     Ronnie Alexander was subjected to inhuman, dangerous and degrading conditions while in solitary confinement for more than five consecutive days—unlawful conditions that had no justifiable purpose.

2.     After two uneventful days in a holding cell, Alexander was transferred to a group pod where his new podmates repeatedly threatened him.  Alexander asked the guards to move him out of that pod several times, but they refused to do so.  Fearing for his life, Alexander believed the only way to protect himself was to tell the guards that he was suicidal.

3.     The jail responded by subjecting Alexander to restrictions far exceeding reasonable suicide precautions for more than five days.  He was placed in what the jail calls its "violent cell." There was no toilet in the cell, so Alexander was forced to urinate and defecate into a small drain in the middle of the floor.  Alexander had to push his feces down through the narrow openings in the grate using the scraps of a paper cup.   Alexander repeatedly asked for toilet paper, but was always denied, and so he was forced to wipe himself with the same paper cup scraps.  During this time, the lights were left on throughout the day and night, which largely prevented Alexander from sleeping.  He was stripped naked and left with nothing but a suicide blanket.  No bedding was

provided—only a concrete slab.  The floor had not been cleaned and was covered in dried urine and fecal matter.  Alexander was also only provided with approximately 24–32 ounces of fluids each day—far less than the recommended amount—causing him to become progressively dehydrated.  For the entire duration, Alexander was never once allowed out of his cell to wash his hands, brush his teeth, take a shower, make a phone call, or exercise.



**Blanket**      **Urination/Defecation      Concrete Sleeping
                    Drain Grate                      Slab**

4.      Meanwhile, Taft had completely abdicated his contracted responsibility to provide mental health care at the jail, assigning only a single, unqualified individual who was not legally authorized to make suicide or mental health care assessments.  As a result, Taft left decisions regarding suicide restrictions entirely to the discretion of unqualified correctional staff.  In other words, the County and Taft installed a system that completely denied any access by inmates to qualified mental health care, a primary function of which is determining appropriate housing for inmates with adverse mental health conditions.  Furthermore, there was no qualified mental health care professional at the jail who could recognize a mental health emergency when it occurred and

respond appropriately.  Mr. Alexander's severely deteriorating mental health was observed and documented by Taft's sole employee, but she ignored her patient's obvious distress.

5.      At the same time, contracted medical staff breached their standard of care by failing to monitor a patient who was being kept in dangerous conditions while on suicide watch.

6.      It is important to note that this case involves two types of harm that, while related, can be separated from one another into distinct claims.  The first claim is that Alexander was harmed by being subjected to the conditions inherent to the violent cell under the express policies of the jail, such as complete isolation, 24-hour bright lighting, a total lack of bedding, and no access to a toilet, shower, sink, or running water of any kind.  These conditions had no justifiable purpose and were therefore unlawful punishment.  The second claim is that Alexander was harmed by intentional acts or omissions, such as the denial of water and toilet paper.

7.      By subjecting Alexander to such inhumane treatment, the County Defendants and Taft have violated his constitutional rights, while Taft and SHP have also fallen far short of their professions' standards of care.

## II.    PARTIES

8.      Plaintiff Ronnie Alexander is a resident of the State of Texas.

9.      Defendant SHP is a Delaware corporation with its headquarters located in Tennessee.  SHP has made an appearance in this case.

10.     Defendant Philip R. Taft, Psy.D & Associates PLLC is a Texas corporation based in Corsicana, Texas, and has made an appearance in this case.

11.     Defendant Philip R. Taft is a resident of the State of Texas and has made an appearance in this case.

12.     Defendants Patterson, Caldwell, Fain, Kreie, Trussell, Martinez, and Harmon are correctional officers at the Henderson County Jail and have made appearances in this case.

13.     Defendant Henderson County is a political subdivision of the State of Texas and has made an appearance in this case.

### III.     JURISDICTION AND VENUE

14.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.  Supplemental jurisdiction over state law claims against SHP and the Taft Defendants is proper under 28 U.S.C. § 1367 because those claims are so related to the claims under § 1983 that they are part of the same case.

15.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Taft resides in the Northern District of Texas, and all Defendants reside in Texas.  SHP resides in Texas by virtue of 28 U.S.C. § 1391(c)(2); the State of Texas may exercise specific personal jurisdiction over SHP, a corporation, because its conduct within Texas gave rise to these claims.

### IV.     FACTUAL ALLEGATIONS

16.     Ronnie Alexander was booked into the Henderson County Jail in the very early morning of March 8, 2021, just after midnight.

17.     Southern Health Partners ("SHP") had been contracted by Henderson County to provide all of the medical care (other than mental health care) at the jail.  All jail medical staff who were not employed by Taft were employed by SHP.

18.     Alexander's medical intake screening—which was not done until March 9—noted that he was not suicidal and showed no signs of intoxication or withdrawal.  Nonetheless, SHP nurse Linda Lacy placed Alexander on the alcohol withdrawal "protocol," which is a generic,

4

standing order pre-authorized by a doctor.  Lacy testified that this is standard SHP policy for any new inmate who reports daily alcohol use; Alexander was never seen by anyone with a more advanced medical license than a licensed vocational nurse.  The protocol includes a suite of prescriptions, including Librium, a strong benzodiazepine.  Alexander does not recall being told he had been put on the protocol.  This action by Lacy was taken sometime before 7 p.m. on March 9, and had no effect on Alexander's housing assignment.

19.     The only other medications authorized by Jail medical staff at intake were Lisinopril, which Alexander had previously been prescribed for high blood pressure, and Clonidine, which was prescribed by the Jail as an additional measure to lower Alexander's blood pressure.

20.     For the first two days at the Jail, Alexander was in a holding cell.  During that time, he was seen twice by Jessica Phlips, an employee of Defendant Philip R. Taft, Psy.D & Associates, which had contracted with Henderson County to provide all of the mental health care to inmates at the jail.  Phlips had no licensing whatsoever and has testified that she is "not a clinician."  She is not qualified under Texas law or national standards related to correctional mental health to make clinical assessments.[1]

21.     On March 8, Phlips saw Alexander for what she described as "observation clearance."  Phlips did not list any current concerns with Alexander's mental health, but noted that he self-reported post-traumatic stress disorder and depression.

22.     On March 9, Phlips saw Alexander again as a follow-up.  On this visit, she noted on her form that she had "no concerns" as to Alexander's mental status, including appearance, behavior, speech and mood.

---

[1] *See infra* ¶¶ 112–115.

23.     The jail then classified Alexander as a maximum-security detainee, despite the fact that his criminal record contained zero felony convictions and only a single prior, non-violent offense that had occurred nearly 30 years earlier.  Thus, on the evening of March 9, Alexander was placed in group detention with some of the most violent and dangerous men being held at the Jail.[2]

24.     Not long after Alexander was placed in group detention with these men, they began making threatening comments to Alexander.  The threats became so severe that Alexander began to fear for his safety.  He also perceived that the anxiety of the situation was causing his blood pressure to spike, which he had already been having problems with since he was arrested.

25.     He asked multiple times to be moved to another cell, explaining that he feared for his health and safety.  The guards refused to move him.  Thinking he had no other option, he told correctional officer Jakob Parras he was suicidal, believing that would force the jail to move him out of the group detention cell for medical or mental health evaluation.

26.     This set in motion more than five days of total isolation and the deprivation of numerous basic human needs.

27.     Just after midnight in the early morning of March 10, correctional officers transferred Alexander to the so called "violent cell."  The guards called Alexander a "bitch" multiple times as they walked him to the violent cell.  One of them said, "You really fucked up now, bitch."  From these comments it can be inferred that the guards did not care about Alexander's fear of his cellmates or spiking blood pressure and wanted to punish him for complaining (i.e., "bitching").  It can be further inferred that they also knew Alexander could expect to suffer while he was in the violent cell.

---

[2] Alexander is not asserting any legal claims of misclassification.

28.     The violent cell has no bed, sink, toilet, shower, or running water of any kind; the only place for an inmate to urinate and defecate is a drain in the middle of the floor. However, the openings in the drain grate are too small for feces to pass through, so Alexander had to force them down manually using pieces of a paper cup. Toilet paper was not provided, for which the paper cup was also used as an ineffective, makeshift substitute. Alexander repeatedly asked for toilet paper from the CO Defendants, but was refused every time. There was also fecal matter and dried urine on the floor from other inmates who had spent time in the toilet-less cell.

29.     Exacerbating this situation was the fact that there was no place for Alexander to wash his hands. And because he was not provided utensils with his food, Alexander was forced to eat (and do everything else) with hands that were perpetually contaminated with fecal bacteria. This continued for the entire five-plus days Alexander was in isolation, since he was never once allowed to leave his cell to use a proper toilet, shower, or wash his hands.



**Mr. Alexander forcing fecal matter down into drain grate**

30.     Alexander was also stripped naked and provided with only a thin "suicide blanket" to cover himself with.  No further bedding was provided, including a pillow, so Alexander was forced to sleep directly on a small concrete slab built into the wall.

31.     Alexander's ability to sleep was also severely inhibited by the very bright lights in the cell being left on at all hours of the day.  Surveillance video inside the cell shows that Alexander was mostly only able to sleep in short, intermittent bursts, which were both few and far between and also at seemingly random times of day.[3]  In addition to preventing sleep, being subjected to five straight days of bright lighting with no respite is highly disorienting in itself, adding another layer to the abusive conditions Alexander was subjected to.

32.     Furthermore, Alexander was only provided approximately three eight-ounce beverages each day, one with each meal.  This is only a small fraction of the recommended fluid intake of 124 ounces per day for an adult male.  Alexander repeatedly asked for water but was repeatedly denied by the CO Defendants.  As a result, Alexander became increasingly dehydrated as his solitary confinement continued.

33.     Alexander was also given no opportunity over the more than five-day span to brush his teeth, wash his hands, or bathe, despite multiple requests to take a shower and generally clean himself up.

34.     Alexander was also never let out of the cell to get any exercise or recreation time of any kind.

---

[3] For about the last 36 hours of his time in the violent cell, Alexander laid on the bench much of the time, although it is unclear whether he was sleeping.  This is likely due to the sheer exhaustion from the preceding approximately four days with very little sleep, as well as increasing dehydration and a deteriorating mental state.

35.     Additionally, multiple guards taunted Alexander with repeated insults and threats. For example, on one occasion they brought a police dog outside his cell and loudly discussed taking Alexander out to a field and unleashing the dog on him, while parading the dog back and forth outside the cell.  They threatened to kill Alexander using a "barbed wire guillotine," which involves placing barbed wire around a person's neck, attaching it to a vehicle on either side, and then driving the vehicles apart from one another so as to behead the victim with the barbed wire. Even as late as the morning of March 15th, just before he was released to Dallas County custody, an officer said, "Ronnie Alexander, you are not leaving this facility alive."

36.     Upon information and belief, the CO Defendants participated in this verbal abuse. Confirmation of this fact has been hampered by the County's failure to preserve any video from outside the violent cell.[4]  At the very least, they heard the abuse and did nothing to stop it. Moreover, these comments indicate the contemptuous attitude the guards had towards Alexander.[5]

37.     Each of the CO Defendants specifically denied Alexander's repeated requests for water, toilet paper, and an opportunity to shower or wash his hands.  Over the entire five-plus days, Alexander was allowed only about three small beverages in total, other than the single eight-ounce

---

[4] Henderson County Sheriff Botie Hillhouse was notified of his duty to preserve all relevant evidence, including video evidence, pertaining to this matter on April 27, 2021.  An open records request for the video and other documents was sent on June 4, 2021.  Approximately four months later, the County produced most (but not quite all) of the video from inside the violent cell. However, it has never produced other highly relevant video, such as that showing the hallway outside the cell or Alexander's time in the group pod.  The County now states that any video it has not already produced no longer exists.  The County has similarly failed to produce critical portions of video—while producing other portions—in response to a related request made by Plaintiff's counsel involving a different inmate subjected to similar conditions in the violent cell.  It may be inferred that these failures to preserve video evidence were intentional spoliation.

[5] While verbal abuse of a pretrial detainee is generally not a constitutional violation itself, such extreme taunting and abuse allows an inference that the CO Defendants were deliberately indifferent towards Alexander's mental and physical health.

beverages provided with each meal.  None of the CO Defendants ever offered Alexander water, toilet paper, or a chance to use a toilet or shower of their own accord.

38.     Alexander never acted physically or verbally aggressive with any guards or inmates—before or after he was placed in the violent cell.  There is no record of any incident involving Alexander or any need for discipline.

39.     Alexander remained in the violent cell until the morning of March 15, when he was released into the custody of Dallas County.

40.     Alexander continued to suffer tremendously from the scars this ordeal had left on him.  The post-traumatic stress was so great that he had difficulty sleeping and suffered from persistent nightmares.  Additionally, his feet had developed infections from being exposed to urine, fecal matter, and generally unsanitary condition of the floor of the violent cell.  Alexander was unable to work full time for more than six months after he was released.

### *Each of the CO Defendants Denied Basic Human Needs*

41.     Correctional officers Jakob Parras and Tori Taylor have testified that the "central officer" position is directly responsible for the violent cell and anyone being housed there.  The jail's shift logs show that the CO Defendants were each assigned to this position for one or more shifts while Alexander was confined to the violent cell.  According to testimony by Taylor and Parras, the central officer was responsible for handling any requests made by an inmate in the violent cell.[6]

---

[6] The central officer is not a supervisory position.  It is a position filled by regular jailers who are directly responsible for the inmates and cells assigned to them, including the violent cell.  The supervisory positions at the jail are ranking officers, such as corporals, sergeants, and lieutenants. None of the CO Defendants were ranking officers during the time at issue in this lawsuit.

42.     Shifts for correctional officers at the jail run from 6 a.m. to 6 p.m. (the day shift) and 6 p.m. to 6 a.m. (the night shift).

43.     Defendant Patterson worked as the central officer and was assigned to the violent cell from 6 p.m. on March 9, 2021 through 6 a.m. on March 10.

44.     Patterson deliberately left the lights on in the violent cell at maximum brightness throughout his shift.

45.     Patterson never allowed Alexander to leave the cell to use a toilet, take a shower, wash his hands, or use running water for any reason.  Patterson denied multiple requests by Alexander for the same.

46.     Patterson denied multiple requests by Alexander for water, and never gave him anything to drink, except for one small (approximately eight-ounce) beverage with breakfast, which was served at approximately 4 a.m. on March 10.

47.     Patterson denied multiple requests by Alexander for toilet paper, and never provided him with toilet paper or any other hygiene products.

48.     Patterson never arranged for the cell to be cleaned or provided Alexander with any cleaning products, despite the fact that the floor was stained with remnants of human waste.

49.     Patterson took no affirmative steps whatsoever to ensure Alexander had sufficient hydration, access to basic human hygiene, or access to minimal bedding.

50.     Patterson took no affirmative steps whatsoever, beyond cursory visual checks, to ensure that Alexander's physical and mental health were not suffering from the conditions he was subjected to in the violent cell.

51.     Defendant Caldwell worked as the central officer and was assigned to the violent cell from 6 a.m. on March 10, 2021 through 6 p.m. on March 10; from 6 a.m. on March 11, 2021 through 6 p.m. on March 11; and from 6 a.m. on March 12, 2021 through 6 p.m. on March 12.

52.     Caldwell never allowed Alexander to leave the cell to use a toilet, take a shower, wash his hands, or use running water for any reason.  Caldwell denied multiple requests by Alexander for the same.

53.     Caldwell denied multiple requests by Alexander for water, and never gave him anything to drink, except for one small (approximately eight-ounce) beverage with lunch and dinner on each shift, which were served at approximately 11 a.m. and 4 p.m., respectively, and one additional small (approximately eight-ounce) beverage around 12:50 p.m. on March 11.

54.     Caldwell denied multiple requests by Alexander for toilet paper, and never provided him with toilet paper or any other hygiene products.

55.     Caldwell never arranged for the cell to be cleaned or provided Alexander with any cleaning products, despite the fact that the floor was stained with remnants of human waste.

56.     Caldwell took no affirmative steps whatsoever to ensure Alexander had sufficient hydration, access to basic human hygiene, or access to minimal bedding.

57.     Caldwell took no affirmative steps whatsoever, beyond cursory visual checks, to ensure that Alexander's physical and mental health were not suffering from the conditions he was subjected to in the violent cell.

58.     Caldwell also knew that Phlips spoke with Alexander on the Morning of March 12 and found him too confused to answer questions.  Despite this obvious evidence of Alexander's seriously deteriorating mental state, Caldwell took no steps whatsoever to address it, and did not report that fact to jail administration or medical staff.

12

59.     Defendant Fain worked as the central officer and was assigned to the violent cell from 6 p.m. on March 10, 2021 through 6 a.m. on March 11, and from 6 p.m. on March 13, 2021 through 6 a.m. on March 14.

60.     Fain deliberately left the lights on in the violent cell at maximum brightness throughout her shift.

61.     Fain never allowed Alexander to leave the cell to use a toilet, take a shower, wash his hands, or use running water for any reason. Fain denied multiple requests by Alexander for the same.

62.     Fain denied multiple requests by Alexander for water, and never gave him anything to drink, except for one small (approximately eight-ounce) beverage with breakfast, which was served at approximately 4 a.m. on each shift, and one additional small (approximately eight-ounce) beverage around 9:50 p.m. on March 10.

63.     Fain denied multiple requests by Alexander for toilet paper, and never provided him with toilet paper or any other hygiene products.

64.     Fain never arranged for the cell to be cleaned or provided Alexander with any cleaning products, despite the fact that the floor was stained with remnants of human waste.

65.     Fain took no affirmative steps whatsoever to ensure Alexander had sufficient hydration, access to basic human hygiene, or access to minimal bedding.

66.     Fain took no affirmative steps whatsoever, beyond cursory visual checks, to ensure that Alexander's physical and mental health were not suffering from the conditions he was subjected to in the violent cell.

67.     Defendant Kreie worked as the central officer and was assigned to the violent cell from 6 p.m. on March 11, 2021 through 6 a.m. on March 12, and from 6 p.m. on March 12, 2021 through 6 a.m. on March 13.

68.     Kreie deliberately left the lights on in the violent cell at maximum brightness throughout his shift.

69.     Kreie never allowed Alexander to leave the cell to use a toilet, take a shower, wash his hands, or use running water for any reason.  Kreie denied multiple requests by Alexander for the same.

70.     Kreie denied multiple requests by Alexander for water, and never gave him anything to drink, except for one small (approximately eight-ounce) beverage with breakfast, which was served at approximately 4 a.m. on each shift.

71.     Kreie denied multiple requests by Alexander for toilet paper, and never provided him with toilet paper or any other hygiene products.

72.     Kreie never arranged for the cell to be cleaned or provided Alexander with any cleaning products, despite the fact that the floor was stained with remnants of human waste.

73.     Kreie took no affirmative steps whatsoever to ensure Alexander had sufficient hydration, access to basic human hygiene, or access to minimal bedding.

74.     Kreie took no affirmative steps whatsoever, beyond cursory visual checks, to ensure that Alexander's physical and mental health were not suffering from the conditions he was subjected to in the violent cell.

75.     Defendant Trussell worked as the central officer and was assigned to the violent cell from 6 a.m. on March 13, 2021 through 6 p.m. on March 13.

76.     Trussell never allowed Alexander to leave the cell to use a toilet, take a shower, wash his hands, or use running water for any reason.   Trussell denied multiple requests by Alexander for the same.

77.     Trussell denied multiple requests by Alexander for water, and never gave him anything to drink, except for one small (approximately eight-ounce) beverage with lunch and dinner, which were served at approximately 11 a.m. and 4 p.m., respectively.

78.     Trussell denied multiple requests by Alexander for toilet paper, and never provided him with toilet paper or any other hygiene products.

79.     Trussell never arranged for the cell to be cleaned or provided Alexander with any cleaning products, despite the fact that the floor was stained with remnants of human waste.

80.     Trussell took no affirmative steps whatsoever to ensure Alexander had sufficient hydration, access to basic human hygiene, or access to minimal bedding.

81.     Trussell took no affirmative steps whatsoever, beyond cursory visual checks, to ensure that Alexander's physical and mental health were not suffering from the conditions he was subjected to in the violent cell.

82.     Defendant Martinez worked as the central officer and was assigned to the violent cell from 6 a.m. on March 14, 2021 through 6 p.m. on March 14.

83.     Martinez never allowed Alexander to leave the cell to use a toilet, take a shower, wash his hands, or use running water for any reason.   Martinez denied multiple requests by Alexander for the same.

84.     Martinez denied multiple requests by Alexander for water, and never gave him anything to drink, except for one small (approximately eight-ounce) beverage with lunch and dinner, which were served at approximately 11 a.m. and 4 p.m., respectively.

85.    Martinez denied multiple requests by Alexander for toilet paper, and never provided him with toilet paper or any other hygiene products.

86.    Martinez never arranged for the cell to be cleaned or provided Alexander with any cleaning products, despite the fact that the floor was stained with remnants of human waste.

87.    Martinez took no affirmative steps whatsoever to ensure Alexander had sufficient hydration, access to basic human hygiene, or access to minimal bedding.

88.    Martinez took no affirmative steps whatsoever, beyond cursory visual checks, to ensure that Alexander's physical and mental health were not suffering from the conditions he was subjected to in the violent cell.

89.    Defendant Harmon worked as the central officer and was assigned to the violent cell from 6 p.m. on March 14, 2021 through 6 a.m. on March 15.

90.    Harmon deliberately left the lights on in the violent cell at maximum brightness throughout her shift.

91.    Harmon never allowed Alexander to leave the cell to use a toilet, take a shower, wash his hands, or use running water for any reason. Harmon denied multiple requests by Alexander for the same.

92.    Harmon denied multiple requests by Alexander for water, and never gave him anything to drink, except for one small (approximately eight-ounce) beverage with breakfast, which was served at approximately 4 a.m., and one additional small (approximately eight-ounce) beverage around 8:30 p.m.

93.    Harmon denied multiple requests by Alexander for toilet paper, and never provided him with toilet paper or any other hygiene products.

94.     Harmon never arranged for the cell to be cleaned or provided Alexander with any cleaning products, despite the fact that the floor was stained with remnants of human waste.

95.     Harmon took no affirmative steps whatsoever to ensure Alexander had sufficient hydration, access to basic human hygiene, or access to minimal bedding.

96.     Harmon took no affirmative steps whatsoever, beyond cursory visual checks, to ensure that Alexander's physical and mental health were not suffering from the conditions he was subjected to in the violent cell.

### Jessica Phlips's "Assessment" of Ronnie Alexander

97.     The only health care provider to examine Alexander while he was in isolation was mental health worker Phlips.  She saw him one time on the morning of March 12, nearly two-and-a-half days after he was first transferred to the violent cell.

98.     Phlips testified that it was not her routine practice to check an inmate's medical file or any other records, including suicide screening forms, prior to evaluating that inmate.  In fact, she testified that she *did not even have access* to the suicide screening forms filled out by correctional officers.  In Alexander's case, there were two of these: one was completed when he was first booked in, and a second on March 10, about five hours after he told the guards he was suicidal.  Thus, Phlips went into this "assessment" completely blind, and did not bother to gather or confirm any information on Alexander, such as why he was in the violent cell, how long he had been in there, whether he was taking any medication, or anything else.  She did not even review her own notes from two prior visits with Alexander.

99.     Phlips quickly aborted her visit when she decided that Alexander was "too confused" to answer her initial questions.  However, by this point, Alexander had been subjected to more than two days of sleep deprivation, dehydration, and total isolation.  Isolation and sleep

17

deprivation can each—on their own—cause anxiety, memory loss, concentration problems, and even hallucinations, all conditions that can manifest as confusion in the patient.

100.    A qualified mental health professional would have been alarmed at Alexander's state and taken steps to address it; indeed, such a professional would have known that the very conditions Alexander was being held in were very likely to be causing his troubled mental state.

101.    Phlips, however, took no action.  Not only did she do nothing to alleviate the conditions that were causing Alexander's psychological deterioration, but she also failed to report her observations to any medical or mental health professionals.

102.    Phlips is not a licensed doctor. She possesses no mental health or medical licensing of any kind.  By her own admission, she is not a clinician. She is therefore unqualified to make a clinical assessment.  As such, the standard of care requires her to report her findings to someone who is qualified to make a clinical assessment.  This is especially important when she finds a patient showing new, acute symptoms of psychological distress.

103.    Phlips, however, did not notify Taft or any other medical or mental health professional about Alexander's obvious distress.  Her failure to do so is attributable to both her own negligence and to Taft's failure to supervise or instruct her regarding this critical aspect of her role.  Further, after observing Alexander's poor state, Phlips did not even review his file at that time to see what might have caused it.

104.    Phlips' failures are also attributable to Taft's (and the County's) decision to operate the jail *without any qualified mental health professionals at all*.

105.    After reporting Alexander's condition to no one, Phlips went home for the weekend.  She did nothing to ensure his condition was followed up on and never saw him again,

while he remained in the violent cell under the horrendous conditions described above for approximately three more full days.

### *The County and Taft Willfully Deprived All Inmates at the Jail of Access to Any Mental Health Care*

106.    As a threshold matter, the policies and practices of Taft are attributable to the County, because the County has a non-delegable duty to provide mental health care at the jail, and Taft is simply standing in the County's shoes when he provides that care instead.  Alternatively, the County fully delegated policymaking authority to Taft and/or collaborated with him in instituting their policies and practices.  The County was aware of Taft's regular practices; all non-medical staff at the Jail, including administrators, are County employees, and work with medical and mental health care staff regularly.  Also, Taft has had his contract renewed at least once, allowing an inference that the County was familiar with the manner in which he was fulfilling his contract and took no issue with it.

107.    Taft's contract with Henderson County was for approximately $75,000 per year. During the time period at issue, he had Phlips—an unlicensed person not legally authorized to provide psychological services—handle all of his responsibilities under the contract. He then paid Phlips 60% of the contract proceeds and kept the remaining 40% for himself as profit.

108.    Taft testified that he provided no professional training to Phlips, and Phlips similarly testified that she had no formal training period at all.  Instead, Phlips was instructed on how to perform her duties by jail officials, who are not licensed psychologists or mental health professionals of any kind.

109.    Further, Phlips testified that no one from Taft's office directly supervised her in any way.  Phlips never sent any of her completed mental health assessment forms to Taft or anyone

at Taft's office for their review.  Taft further stated that he only had "one or two" conversations with Phlips while she was working at the Jail, but he could not recall what they were about.

110.    Taft also provided no written policies or procedures for Phlips to follow.

111.    In sum, Taft outsourced all of the clinician-level work required by the contract to an unqualified person, while contributing none of his own effort or expertise, but pocketed 40% of the contract price anyway.  This conduct is expressly prohibited by Texas law.

112.    Psychologists are limited by Texas law in how they may utilize unlicensed individuals.  They "may employ unlicensed individuals only to perform services which do not constitute the practice of psychology or the activities and services of another licensed profession. Permissible duties include: (1) Secretarial and clerical duties such as scheduling appointments or processing insurance forms; (2) Data gathering, such as administering, proctoring, or scoring non-projective tests, obtaining histories or obtaining documentation for record keeping purposes, provided that it does not require psychological education or involve the provision of psychological services; and (3) Technical, educational, or other duties that are adjunctive to and incorporated into the provision of psychological services such as providing educational information or assisting a client's work with a computer, special equipment or special materials, provided that the duties do not require psychological education or involve the provision of psychological services or the services or activities of another licensed profession.[7]

113.    In other words, unlicensed persons can only be used to assist the work of licensed professionals, whose responsibility it is to provide psychological services.

114.    The National Commission on Correctional Health Care ("NCCHC") is an organization that publishes standards regarding the provision of health care in correctional

---

[7] TEX. ADMIN. CODE § 465.4.

facilities.  These standards have been recognized nationally as describing the applicable minimum standards for correctional health care.[8]

115.   NCCHC defines "mental health staff" to include "qualified health care professionals who have received instruction and supervision in identifying and interacting with individuals in need of mental health care services."  Phlips did not meet this definition, as she received no instruction or supervision, nor was she a "qualified health care professional," which the NCCHC defines as someone who "by virtue of their education, credentials, and experience are permitted by law to evaluate and care for patients."[9]  As described above, Phlips was not permitted by Texas law to evaluate and care for patients.

116.   Despite the fact that Texas law prohibited Phlips from providing psychological services, Taft employed her as the sole provider of mental health care at the jail.  In other words, he was not providing any actual mental health care at the jail at all.  As a result, inmates at the jail, including Alexander, had no access to qualified mental health care.  This is a clear breach of the standard of care and the duty Taft owed to the inmates at the jail, whom he took on as his patients when he agreed to provide their mental health care.

117.   Furthermore, Texas law states that "Licensees are responsible for ensuring that all individuals practicing under their supervision are competent to perform those services."[10]  Taft's failure to ensure this was knowing and willful.  The decision was based entirely on a desire to keep his costs as low as possible and maximize his own profit from the contract with Henderson County.

---

[8] *See Gates v. Cook*, 376 F.3d 323, 342–343 (injunction requiring a correctional facility "to comply with ACA and National Commission on Correctional Healthcare standards regarding mental health" affirmed as justified by the Eighth Amendment).

[9] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-A-02 ("Responsible Mental Health Authority").

[10] TEX. ADMIN. CODE § 465.9(f).

118.    In its Standards for Mental Health Services in Correctional Facilities, the NCCHC's first and most fundamental standard is that "inmates have access to care to meet their serious mental health needs."[11]

119.    The NCCHC Standards define "access to care" as "in a timely manner, a patient can be seen by a clinician, be given professional clinical judgment, and receive care that is ordered."[12]  None of this was possible at the Henderson County Jail due to the total unavailability of any clinicians, i.e., anyone capable of providing professional clinical judgment.

120.    Texas law also requires the provision of mental health services at jails.[13]

121.    Taft and the County breached these standards by intentionally providing only a single, unlicensed, unqualified person to allegedly provide mental health care at the jail.  Worse, the system did not include Phlips even contacting Taft for help or advice.

122.    Taft testified that he believed Sheriff Botie Hillhouse and the other ranking officers at the jail knew that Phlips had no license.   They were additionally aware from simple observation that she was unsupervised and the only person allegedly providing mental health care at the jail.  As such, it was the jail's **express policy** to deny its entire inmate population access to mental health care of any kind.

123.    Related to the above, the NCCHC states that "clinical decisions and actions regarding mental health care provided to inmates . . . are solely the responsibility of qualified

---

[11] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-A-01 ("Access to Care").

[12] *Id.*

[13] TEX. ADMIN. CODE § 273.1 ("The owner/operator of each facility shall provide medical, mental, and dental services in accordance with the approved health services plan.").

mental health professionals. . . .**The intent of this standard is to ensure clinical decisions are made for clinical purposes and without interference from other personnel**."[14]

124.    As previously noted, "qualified mental health professionals" are those who "are permitted by law to evaluate and care for the mental health needs of patients."[15]   In other words, decisions regarding appropriate restrictions to prevent self-harm (or whether any such restrictions are necessary) must be made by someone capable of making clinical assessments.  Phlips was not; the correctional officers were not.  Again, not a single person at the jail was capable of making such decisions.

125.    Instead, both Taft and Phlips have testified that final decisions regarding housing and other restrictions used for an inmate identified as potentially suicidal were the responsibility of correctional officers, who are even less qualified to make such decisions than Phlips.

126.    Delegating these decisions to correctional officers completely undermines the standard of care described above.  It not only allows the "interference from other personnel" the standard is intended to avoid, but *completely relies on it*.

127.    To illustrate this point, such deference to correctional officers resulted in the egregious treatment of another inmate in a separate incident.  On approximately May 24, 2022, an inmate named Adriane Olvera was placed in the violent cell for suicide concerns.  Within the first week, she was seen twice by Kevin Jeffries (Taft's replacement for Phlips).  After the second visit, Jeffries told Olvera that he did not believe she needed to remain on suicide watch.  Nonetheless, Olvera was kept in the violent cell an additional 28 days without explanation—with no clothing,

---

[14] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-A-03 ("Clinical Autonomy").
[15] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-A-02 ("Responsible Mental Health Authority").

bedding, or items other than a suicide blanket, no regular access to a toilet, shower, sink, or basic human hygiene, and lights on in the cell 24-hours-per-day.  Jeffries did not reassess Olvera or visit her for any reason after the first week.  Olvera's case is described in more detail below.

128.    Additionally, the NCCHC notes the following standards:[16]

129.    "The mental health of segregated inmates is monitored regularly. . . . The intent of this standard is that mental health staff monitor segregated inmates for signs of mental or physical decompensation.  Persons in segregated environments are vulnerable to mental illness . . . ."[17]

130.    Compliance indicators include, "On notification that an inmate is placed in segregation, mental health staff reviews the inmate's mental health record to determine whether existing mental health needs contraindicate the placement or require accommodation.  Such review is documented in the clinical record."[18]

131.    Taft and the County failed to meet the above standards.  No review was ever made to determine whether segregation was appropriate for Alexander, who had reported pre-existing pot-traumatic stress disorder and depression.  Nor was Alexander monitored in any real way.  The single time Phlips spoke to Alexander, she observed his severely deteriorating mental health and did nothing.  This completely subverts the purpose of monitoring such individuals in the first place.  Underlying all of this is the fact that not a single person at the jail would even qualify as "mental health staff" under the NCCHC's definition.

132.    The NCCHC also provides the following guidance:

---

[16] These standards are a sampling of relevant standards from the NCCHC and are not intended to be an exhaustive list.

[17] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-E-07 ("Segregated Inmates").

[18] *Id.*

133.    "Mental health staff order . . . clinical seclusion only for patients exhibiting behavior dangerous to self or others as a result of mental illness."[19]  Alexander was exhibiting no dangerous behavior.  Moreover, Alexander's seclusion was ordered solely by correctional officers, without any input from medical staff or Phlips.

134.    "With regard to . . . clinical seclusion, policies and procedures specify: the . . . conditions of seclusion that may be used; when, where, how, and for how long . . . seclusion may be used; . . . [and] that proper nutrition, hydration, and toileting are provided."[20]  Neither the jail nor Taft implemented any such policies.  Notably, there was no policy in place describing how someone would be removed from seclusion in the violent cell.  Instead, the policy was simply to defer completely to the discretion of correctional officers.  As noted above, such a policy is a serious, fundamental breach of the standard of care, which is that any such decisions must be made by a physician or qualified mental health professional.

135.    "In each case, use [of seclusion] is authorized by a physician or other qualified mental health professional where permitted by law, after reaching the conclusion that no other less restrictive treatment is appropriate."[21]  No such review ever occurred, nor was any authorization made by a physician or qualified mental health professional (which, again, was wholly unavailable at the jail).

136.    "Every 15 minutes, health-trained personnel or health services staff check on any patient in . . .clinical seclusion.  Such checks are documented."  This did not happen.  Correctional officers at the jail are not "health-trained."  Phlips checked on Alexander one time in five-plus

---

[19] NAT'L COMM. ON CORR. HEALTH CARE, *Standards for Mental Health Services in Correctional Facilities*, MH-I-01 ("Restraint and Seclusion").
[20] *Id.*
[21] *Id.*

days; the other medical staff did nothing more than pass Alexander medication once per day without entering the cell, examining Alexander, or even asking him any questions.

137.    "The treatment plan provides for removing patients from . . . seclusion as soon as possible."[22]  No "treatment plan" was ever created for Alexander, and no plan was ever made to remove him from seclusion at all, let alone "as soon as possible."  Indeed, it may be inferred from the total lack of any such documentation that the intention was to leave him in the violent cell until Dallas County came to pick him up.   Moreover, Taft and the County had no policies addressing this issue.  Again, such decisions were left completely to the *ad hoc* discretion of the jailers.

138.    "Patients are not . . . secluded in a manner that would jeopardize their health or mental health."[23]  As described above, the inherent conditions of the violent cell, the denial of the most basic elements of human hygiene, dehydration and sleep deprivation most certainly jeopardized Alexander's mental and physical health.

139.    "Generally, an order for clinical . . . seclusion is not to exceed 12 hours, but state health code requirements may vary."[24]  In fact, Texas statutory law limits seclusion by mental health care providers to a maximum of 8 consecutive hours.[25]  Furthermore, seclusion must be authorized by a physician, and must be re-authorized by a physician after the first four hours.[26] The justification for these authorizations must be documented.[27]  Alexander was in seclusion for approximately 128 consecutive hours, without any authorization from a physician or any other qualified health professional.

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] TEX. ADMIN. CODE § 415.261(b)(4).
[26] TEX. ADMIN. CODE § 415.261.
[27] TEX. ADMIN. CODE § 415.261(c).

140.   "All aspects of the standard are addressed by written policy and defined procedures."[28]   Neither the jail nor Taft maintained written policies or defined procedures regarding any of the above recognized standards.

141.   Taft also testified that he did not provide the training materials used by correctional staff regarding suicide prevention, and was not aware of their source.

142.   In sum, the standard of care requires a complex, multifaceted approach that minimizes unnecessary restrictions, monitors inmates regularly, and is overseen by a qualified mental health professional making necessary clinical judgments at every step. The primary purpose is to ensure the inmate–patient's mental health.

143.   In stark contrast, Taft's system of mental health care at the Jail did not utilize a single qualified mental health care professional.  The harsh and unjustified conditions of the violent cell were applied to anyone and everyone with even a hint of potential self-harm, with no regard to the actual risk.  In short, clinical decisions such as appropriate restrictions for those who may harm themselves were ultimately made by untrained correctional officers.  It is difficult to imagine a system of mental health care more fundamentally incompatible with the standard of care than one that relies entirely on people who are not legally authorized to provide such care.

144.   Taft's (and the County's) policy failures outlined above prevented Alexander from being properly assessed for appropriate suicide precautions, resulting in his being subjected to harmful restrictions that went far beyond reasonable suicide precautions.  Moreover, Alexander was left in seclusion and on suicide watch for much longer than medically necessary or justifiable. This would have been entirely prevented if Taft and the County had adhered to the standards of care outlined above.  The standards allow an inference that timely evaluation by a qualified mental

---

[28] *Id.*

health professional would not have authorized the restrictions enforced against Alexander. Furthermore, a qualified mental health professional would have taken action to remove Alexander from those conditions when she observed his severely deteriorating mental health on March 12.

### The Jail's Express Policies Regarding Suicide Prevention Are Facially Unlawful

145.    As described in detail above, the jail's total lack of mental health care is facially unlawful and caused the harms alleged in this lawsuit to occur.    Additionally, the specific restrictions employed by the jail for inmates with any potential risk of self-harm (under the policies of the County and Taft) are facially excessive and unreasonable.

146.    According to testimony by former Defendants Jakob Parras and Tori Taylor, all inmates designated as potentially suicidal are placed by default in the violent cell.

147.    The following restrictions are employed by express policy: they all have their clothes and bedding removed; they all have the lights on 24-hours-per-day; none have access to a toilet, shower, or running water.    In fact, former Defendant Tori Taylor testified that inmates in the violent cell are never allowed to leave the cell to use an actual toilet, because "they already have a drain in the cell."

148.    Suicide precautions at the jail are "all or nothing."    These inmates are *never* assessed by a qualified clinician to determine what restrictions are actually necessary based on the individual's risk of self-harm, because Taft and the County have completely failed to provide one. All such inmates have to suffer the full menu of restrictions in the violent cell until they are released to general population.

149.    The jail has no policies whatsoever providing guidance as to how a determination is made that an inmate will be released from the violent cell.    Taft and Phlips both testified that

instead, such determinations are left to the discretion of correctional officers.  As noted above, this is a serious, fundamental breach of the standards applicable to mental health care in jails.

150.    Former Defendant Jakob Parras testified that while inmates identified as potentially suicidal always went to the violent cell by default, occasionally they would be moved into the much less restrictive "separation cells" if the jail decided it needed the violent cell for someone who was genuinely violent.  Unlike the violent cell, "separation cells" have a toilet, sink, shower, table, and bed.  This fact makes it evident that the jail did not believe the extra restrictions of the violent cell were actually necessary for someone with suicide risk.

151.    The restrictions employed at the jail under their express policies, described above, went far beyond reasonable suicide precautions.  This would be true even for someone who has a genuinely high risk of self-harm.

152.    Denying access to a toilet, shower, sink, and running water of any kind—even with supervision—serves no justifiable purpose in the prevention of suicide.

153.    Denying access to any and all basic hygiene products, including toilet paper, soap, and a toothbrush and toothpaste, even with supervision, serves no justifiable purpose in the prevention of suicide.

154.    Denying access to a minimal amount of bedding, such as a mattress and pillow, serves no justifiable purpose in the prevention of suicide.

155.    Leaving the lights on in the cell at maximum brightness all hours of the day serves no justifiable purpose in the prevention of suicide, or is excessive in light of any such purpose. For example, periodic checks that occur overnight could be accomplished with substantially lower lighting, or with the lights turned on only when the check is performed.  This is especially true in light of the fact that the violent cell contains no items whatsoever that could be used for self-harm.

156.    These policies were the express policies of both the County and Taft, its designated mental health care provider.

### *Medical Staff Completely Failed to Monitor Alexander's Health*

157.    Placing an inmate in a secluded cell is inherently hazardous to that inmate's mental and physical health.  This is clear from the NCCHC standards, outlined above, as well as SHP's own written (but unfollowed) policies.

158.    It can be inferred from SHP's written policies that the standard of care requires medical staff to monitor the health of anyone on suicide watch or placed in seclusion.  For example, these policies include:

- When an inmate is placed on medical observation (which includes both suicide watch and the alcohol withdrawal protocol), an observation schedule must be established using the "Medical Monitoring Flowsheet Form."

- Progress notes (notes made by nurses to document interactions with patients) should be used to document noteworthy changes in the inmate's condition.

- Vital signs should be taken at least once per shift (twice per 24-hour period).

- The Medical Director should be informed of any inmate placed on observation to ensure the appropriateness of the treatment plan, and should be kept abreast of any developments.

- Upon notification by correctional officers to medical staff of a patient's segregated status, the medical staff should see the patient initially to record his/her current health status.  Medical staff must also review the patient's medical chart to determine if any existing medical needs would contradict such placement. Any findings must be reported to the Jail Administrator.

- If possible, a potentially suicidal inmate should not be isolated, but housed with another patient.

- A suicidal inmate should only be placed in a "stripped cell" with a suicide smock if assessment concluded the patient is a definite suicide risk.

- When Medical Staff are on-site, referrals to the designated Qualified Mental Health Professional must be placed immediately (within 30 minutes). The Jail Administrator must be notified of the patient's current status as well.

- Patients are to be re-assessed each day on a regular schedule to identify any change in condition or status.

159.   These official policies of SHP are similar to a number of the standards published by the NCCHC, further indicating that they reflect the standard of care.  Some of these standards are outlined above (see ¶¶ 128–140).  Additionally, in its Standards for Health Services in Jails, the NCCHC states its basic rule regarding seclusion as, "Any practice of segregation should not adversely affect an inmate's health."[29]  To serve that purpose, jail medical providers must utilize certain policies, such as:

- Upon notification that an inmate has been placed in segregation, a qualified health care professional reviews the inmate's health record.  If existing medical, dental, or mental health needs require accommodation, custody staff are notified.[30]

- Inmates in solitary confinement with little or no contact with other individuals are monitored daily by medical staff.[31]

---

[29] Nat'l Comm. on Corr. Health Care, *Standards for Health Services in Jails*, J-G-02 ("Segregated Inmates").
[30] *Id.*
[31] *Id.*

- Observation by medical staff is documented.[32]

- Health staff promptly identify and inform custody officials of inmates who are physically or psychologically deteriorating.[33]

160.    The importance of such monitoring in this case was only increased by the facts that (a) Alexander was known to have post-traumatic stress disorder and depression; (b) he had been placed by medical staff on the alcohol withdrawal protocol; and (c) he was being treated for high blood pressure.

161.    In other words, the standard of care, taken as a whole, requires medical staff to take steps to ensure that a "practice of segregation [does] not adversely affect an inmate's health."

162.    SHP medical staff failed to follow **any** of the above policies and/or standards.  As noted above, Alexander's medical file contains virtually no documentation whatsoever after he was placed in the violent cell.  This total failure continued for the entire five-plus days Alexander was in the violent cell.

163.    SHP staff were aware of the conditions of the violent cell, which is located in close proximity to the nurse's station.  Subjecting Alexander to these extreme restrictions, including several likely to lead to sleep deprivation, was contraindicated by Alexander's known history of post-traumatic stress disorder.  This is especially true when medical staff knew that proper suicide assessment by a qualified mental health professional had not been performed and was unavailable.  SHP nurses breached the standard of care when they allowed Alexander to remain in the violent cell without any consideration of his PTSD and depression.

---

[32] *Id.*
[33] *Id.*

164.    Restricting Alexander's access to drinking water was contraindicated by Alexander's presence on the alcohol detox protocol.  Dehydration is especially dangerous for someone potentially withdrawing from alcohol.  SHP nurses again breached the standard of care when they did not monitor Alexander for sufficient hydration while he was on the alcohol detox protocol.

165.    Comparing Phlips's notes from March 12 with her notes from seeing Alexander on March 8 and 9, it is clear that his mental health deteriorated significantly after being placed in the violent cell.  Had SHP staff followed their own stated policies, such a marked change would have been observed and action taken.  Failing to do so was a breach of the standard of care.

166.    In fact, SHP nurses had been monitoring and treating Alexander's blood pressure *before* he was transferred to the violent cell, because it was elevated, but that stopped completely after his transfer.  His blood pressure was never taken, nor were his vitals ever checked while he was in the violent cell.  Medical staff never even asked Alexander about his wellbeing, or performed even the most cursory visual check.  From this it may be inferred that the medical staff intentionally decided to stop monitoring Alexander's health while he was in the violent cell.

167.    This is flatly in contradiction of official SHP policy (and Lacy's testimony) that anyone on suicide watch is supposed to be monitored for wellness and have their vitals checked and recorded once per shift (twice per 24-hour period).  However, jail medical staff never did this, and there are no records reflecting such monitoring.[34]

---

[34] Records purport to show that Alexander's blood pressure was checked one time each on March 12, 13 and 14.  Alexander does not recall any such checks.  The alleged checks on the 12th and 13th occurred during periods for which the video was apparently destroyed. The video that was produced does confirm that **no check occurred** at or near the time alleged on March 14.  Thus, that entry appears to be falsified.  It may be inferred that all three entries were falsified.  No documentation exists for any other vital sign readings while Alexander was in the violent cell.

33

168.     As previously noted, Texas law requires jails to follow the instructions of physicians.     Had SHP staff followed their own stated policies and/or the fundamental standard of care, Alexander would not have remained subjected to the deleterious conditions of the violent cell for five-plus days, which was certainly a "practice of segregation" that "adversely affect[ed] an inmate's health."  Failing to do so was a breach of the standard of care.

### *The Jail Maintained a Custom or Practice of Using the Violent Cell for Punishment*

169.     In addition to the inherently unlawful conditions imposed by the jail's express policies for suicide prevention, the jail also customarily used the violent cell for punishment.

170.     A number of inmates other than Alexander are known to have suffered similarly in the violent cell.

171.     On approximately May 24, 2022, an inmate named Adriane Olvera was placed in the violent cell for suicide concerns.  Within the first week, she was seen twice by Kevin Jeffries (Taft's replacement for Phlips).  After the second visit, Jeffries told Olvera that he had cleared her from suicide watch.  Nonetheless, Olvera was kept in the violent cell an additional 28 days without explanation—with full suicide restrictions, including no clothing or items other than a suicide blanket, and lights on in the cell 24-hours-per-day.  Jeffries did not reassess Olvera or visit her for any reason after the first week.  During her 35 days in the violent cell, Olvera was allowed only about six showers.  She was only allowed to wash her hands or brush her teeth when she was allowed a shower.

172.     Ranking jail staff refused to speak with Olvera or provide a reason for keeping her in the violent cell.  Other officers told her only she she needed to "act better;" specifically, that she should stop kicking the door (which she occasionally did when no one would bring her water or toilet paper), and covering up the camera, which she also did occasionally (and briefly) to keep

jail staff (which includes many male officers) from seeing her use the drain to relieve herself (recall that she only had a suicide blanket and was otherwise naked).

173.    Once, a guard named Israel Lopez brought Olvera a meal that was missing some portions.  When Olvera asked him to bring the missing food, he refused and said, "If you want to eat, bond out."  Another time, Lopez told Olvera that if he saw her in the free world, he would "put a bullet between her eyes."  Olvera asked him why he would do that, and he said, "because you're just poor dopehead scum and the world would be better off without you."  Lopez then told her to lay down and quit breathing, even though Olvera was supposedly on suicide watch at the time.

174.    Correctional officer Tori Taylor, formerly a defendant in this case, made cruel comments to Olvera while denying her basic essentials.  Once, when Olvera asked for toilet paper, Taylor refused to provide it, and said Olvera should use the suicide blanket instead.  Another time, Taylor refused to provide water, saying that Olvera should drink the sewage water from the drain she used as a toilet.

175.    At one point while Olvera was in the violent cell, she began menstruating.  Blood was everywhere, due to the fact that she had no hygiene products, no underwear, no toilet paper, and nothing else to clean up with.  This occurred in the evening when Defendant Patterson was supervising the cell.  He refused to provide Olvera with anything or help in any way, leaving her and the cell covered with blood all night long.  Olvera finally got to take a shower and the cell was cleaned up at some point during the next day shift, but not before she suffered for many hours without help.

176.    Olvera was also not allowed to see medical staff.  She needed Prilosec for indigestion caused by a chronic condition, but was never given any.  She was also not allowed to submit written sick calls, which is generally the only way to obtain medical care.

177.     On January 18, 2022, Cody Albritton was arrested and brought to the Jail.  Albritton was 37, but suffers from severe mental illness and intellectual disability.  His mental age is approximately that of a seven-year-old.

178.     Albritton was placed in the violent cell.  After he threw the first food tray and drink back at the guards in frustration, he was not offered any more to drink—even with meals—for the entire 48-hour period he was in the violent cell.  Also, Albritton took an array of medication daily to control his serious mental illness.  The Jail refused to provide Albritton with *any* of his regular medication; surveillance video makes it clear that Albritton suffered terribly as a result.  Instead of his prescribed medication, like Alexander, SHP gave him large doses of Librium without examination by a doctor, through their withdrawal "protocol."  Finally, Albritton had diarrhea inside the violent cell shortly after he was detained.  Video shows the pool of diarrhea remained on the concrete bench the entire time Albritton was incarcerated, leaving him nowhere to even fully lie down without befouling himself.[35]  All of this occurred right under the noses of medical and mental health staff, who never examined Albritton.  Albritton was only released from the violent cell because his mother bonded him out.

179.     Ricky Frosch was arrested on June 22, 2021 and placed in the violent cell for suicide concerns.[36]  For 48 hours in the violent cell, Frosch was not given any water other than the 8-

---

[35] As with Alexander, the County's production of video pursuant to an open records request about Albritton was incomplete.  Virtually no video outside the violent cell was provided.  Also, approximately the first twelve hours of Albritton's time in the violent cell—which he alleges were the "worst"—were inexplicably not provided.  As with Alexander, the County asserts any video that was not already produced no longer exists.

[36] *See Frosch v. Alsobrook*, Civil Case No. 6:22-cv-236, E.D. Tex., Tyler Div.  Frosch separately asserts that he suffered a broken clavicle from being pressed forcefully against a wall and then slammed onto the ground while handcuffed at the Jail.

ounce cup with meals, was denied toilet paper, and was never allowed access to a toilet, shower, or running water.

180.    Larry Posey was subjected to similar conditions in the violent cell on two separate occasions.  The first time was for approximately eight consecutive days in 2017.  During that time, he was repeatedly denied water and toilet paper.  The inmate was not allowed access to a toilet, shower, or running water for those eight days.  He was placed in the violent cell again and subjected to the same deprivations of basic essentials for approximately two days in 2021, after he refused to enter a cell with another man who he thought was likely to start a fight with him.  On this occasion, he was ordered into the violent cell by jail captain Cody Barnett (ranking behind only the sheriff and major among jail administrators).

181.    The County produced a number of inmate grievances complaining about their treatment in the violent cell.  On February 13, 2019, Bobby Daniels complained, "I've been in this cell since last week, I have not had a shower.  I am not able to wash my hands and can only use my fingers to eat.  It is unsanitary and cruel and unusual punishment.  I do not feel like hurting myself and I talked to the doctor.  I would like to have my clothes back, it is very cold in there.  I haven't been able to make a phone call since I've been in here."

182.    On January 29, 2020, Amber Lawson complained, "I'm concerned about procedures that I have since found out are very common and extremely unprofessional when inmates are booked in or after problems with staff.  Concerned about the nasty conditions of the suicide watch/rubber room.  After 5 days without toilet paper or cleaning supplies or even the slightest amount of soap, I was forced to clean myself after a bowel movement with my blanket.  Because I was stripped naked, I was cold and had to use that same blanket to cover with.  The entire time I was in there the officers and staff were cruel and unnecessarily insulting."

183.    Barnett's response to Lawson made only general comments such as "an inmate that has been initially identified as mentally disabled or potentially suicidal shall be placed in a medical separation or holding cell . . . until evaluated by medical or mental health professionals."  Note however, that the violent cell is **not the same** as a "medical separation or holding cell," which have beds, toilets, showers, and running water.  Barnett's response also must be taken in light of the fact that, as described above, evaluation by a qualified mental health clinician is not available.  He did not address any of Lawson's substantive complaints, other than to assert that toilet paper is available upon request.

184.    On February 8, 2022, Jeremy Cook complained, "While I was in the violent #1 cell for 3 days it was so cold I could not sleep, and nobody would give me a shower, y'all did that to punish me once again."  Barnett's response simply said that the Texas Commission on Jail Standards required temperatures between 65 and 85 degrees, and that the violent cell was within that.  It should be noted that 65 degrees is quite cold for someone who has had their clothes taken away.  Cook has stated that he was also denied requests for water and toilet paper during this time.

185.    On May 17, 2021, Ryan Hoskins complained, "I was assaulted by staff while in and out of seizure state.  I was retaliated against for reporting it and tortured for 3-5 days in the violent cell, though I displayed no signs of aggression.  I was not allowed to shower or brush my teeth.  I was not offered water except for a sip with my medication . . ."

186.    Barnett's response again attempts only to cite written policy without addressing Hoskins's substantive complaints.  Barnett says Hoskins was placed in the violent cell because he made suicidal comments.

187.    These examples show a clear pattern of abusing inmates placed in the violent cell for suicide concerns or other reasons, and using the violent cell for punishment.  This is also

evidenced by the comment to Alexander, as he was being transferred to the violent cell, that he "really fucked up now." Upon information and belief, the above examples are only the tip of the iceberg.

188.    In sum, placement in the violent cell is a trap from which the only escape is at the discretion of the guards. This is due to (a) the total unavailability of evaluation by a qualified mental health clinician, (b) the ultimate clinical decision regarding what restrictions to leave in place being left to unqualified correctional staff. The jail has an established pattern of using the violent cell as a sort of "black box" in which inmates may be subjected to cruelty and deprivation of basic human essentials as means of punishment. These practices continue, in part, due to the total indifference of contracted medical and mental health staff, and a complete lack of professional mental health/medical oversight and safeguards against potential abuse.

### *Jessica Phlips Was Aware of Abuse Occurring in the Violent Cell*

189.    Jessica Phlips was provided no policies or guidelines by Taft. Instead, she was expected to follow instructions from ranking jail staff. As noted above, this contradicts the standard of care, which requires medical staff to retain autonomy regarding clinical decisions (Phlips was unqualified, and not legally authorized, to make clinical decisions, but that is a separate problem).

190.    Phlips knew that any inmates identified as potentially suicidal were always placed in the violent cell—which has no sink, toilet, shower, or bed—unless they were already full. When they were full, such inmates were placed instead in what the jail calls "separation cells." These are single-occupant cells but contain a toilet, sink, shower, bed, and table. The jail would also move inmates at risk of self-harm from a violent cell to a separation cell when a legitimately violent person required the violent cell.

191.    From these facts, it may be inferred that the jail did not believe the extra restrictions of the violent cell were actually necessary for someone with suicide risk.

192.    The fact that the jail systematically subjected potentially suicidal inmates to the extreme restrictions of the violent cell, rather than the more amenable conditions of the separation cell, should have alerted Phlips to the fact that the guards were using the violent cell for punitive reasons.

193.    This is especially so because the jail was extremely liberal in its identification of potentially suicidal inmates: according to Phlips, even someone who had attempted suicide ten years prior, but had no current suicidal ideations and no other self-harm concerns in the last ten years, would be put into the violent cell.

194.    Phlips also knew that she was not authorized to make clinical assessments, and therefore, no inmates at the jail were ever receiving legitimate, clinical mental health assessments. Instead, she knew that clinical decisions, such as when to place someone in the violent cell and how long they would remain there, were entirely at the discretion of unqualified correctional officers.

195.    Phlips also knew that the jail would sometimes ignore her recommendations to release an inmate from the violent cell.

196.    Phlips also testified that in the short period she worked at the Jail (approximately three months), she had heard "a lot" of inmates complain about the lack of access to a toilet while they were in the violent cell.  Phlips did nothing to address those complaints.  They also complained to her about not having toilet paper; Phlips claims to have been unable to provide toilet paper herself, and testified that correctional officers' response "depended on the time of day or how I caught them or what they were doing at the time."  In other words, she knew that at least

sometimes, guards did not provide toilet paper to inmates in the violent cell.  Similarly, Phlips testified that at least some of the time, the guards would deny requests by inmates in the violent cell to take a shower.  She also testified that the violent cell smelled like human waste.

197.    A reasonable and qualified mental health or medical professional who was aware of these repeated complaints of the denial of basic essentials would have been aware of a serious risk that anyone held in the violent cell would be subjected to the same deprivations.  In turn, a reasonable mental health professional would have understood the importance of not keeping an inmate in the violent cell when he was not a serious threat to himself or others.

198.    Phlips should have reported these inmate complaints as soon as she heard them. Instead, she kept quiet and allowed correctional staff to continue mistreating inmates.  Had Phlips made such a report to an appropriate authority (such as Dr. Taft, the jail physician, jail administration, or the Texas Rangers[37]), intervention by that authority would have prevented officers from continuing to perpetrate this abuse.  Correctional facilities are required by Texas law to comply with physicians' orders.[38]  Moreover, the jail's written policies state that "staff members shall adhere to all medical or mental health officials' instructions and recommendations relating to the supervision of potentially suicidal inmates."  Failing to report these complaints fell short of the standard of care for medical/mental health staff in a correctional facility.

199.    Taken together, the facts listed above would have put a reasonable mental health professional—licenses or otherwise—on high alert that correctional officers were abusing their authority and using the violent cell to abuse inmates.  Phlips, however, took no action whatsoever.

---

[37] The Texas Rangers have statewide law enforcement authority over misconduct by public officials.

[38] TEX. ADMIN. CODE § 273.3 ("All medical instructions of designated physicians shall be followed.").

200.    Jail officials of all kinds have a general duty to protect the safety and wellbeing of inmates.[39]   Medical professionals in other custodial environments have the same duty.   For example, in the case of nursing homes, staff are required by Texas law to report suspected abuse.[40] Considered in light of the additional standards for correctional mental health care detailed above, it may be inferred that Phlips had a duty to report this suspected abuse to an authority who could act on it.   Instead, she breached that duty by never taking any action.

201.    Additionally, Taft testified that he took no steps whatsoever to identify or prevent abuse of inmates by correctional staff.   This is contrary to the position of the National Commission on Correctional Health Care, which is that correctional mental health care providers must "Identify and report incidents of mistreatment to the appropriate authority" and "not participate in or condone any form of mistreatment of incarcerated people."[41]   "Mistreatment" is a broad term that "may include physical or mental abuse, sexual abuse, torture, neglect, disrespect, financial exploitation, and other harmful actions."

202.    As described in detail above, Taft also failed to provide any qualified mental health professionals at the jail.   In short, he failed to provide any mental health care at all, and left his patients—the inmates—without any independent mental health oversight, a critical safeguard against abuse.   He did this knowingly and willingly, and instead gave free rein to correctional officers to treat the inmates as they pleased.   In doing so, he breached the standard of care and was deliberately indifferent to the rights of his patients.   A responsible mental health professional who took his position seriously would never have allowed this abusive environment to flourish.

---

[39] *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (citing *Deshaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200 (1989)).
[40] TEX. HEALTH & SAFETY CODE § 260A.002(a).
[41] https://www.ncchc.org/correctional-health-professionals-response-to-inmate-abuse-2017/.

## V.   FIRST CAUSE OF ACTION: VIOLATION OF INMATE'S RIGHTS UNDER 42 U.S.C. § 1983

203.    All preceding paragraphs are incorporated here by reference.  **Plaintiff does not assert any claims under § 1983 against SHP at this time, but reserves the right to add such claims in the future.**

### *The Taft Defendants*

204.    The Taft Defendants, as private actors contracted by the County to provide mental health care at the Jail, are state actors under § 1983.

205.    Taft's system of mental health care at the Jail was grossly inadequate and failed to comply with numerous recognized standards for correctional mental health care (see above, ¶¶ 106–156).  The constitution requires jails to provide a minimum level of mental health care, which the Fifth Circuit has found to be described in the NCCHC standards.[42]

206.    In short, Taft failed this requirement by providing no legally qualified mental heath care at the jail at all.  This fundamental failure prevented any inmates at the jail, including Alexander, from being assessed by someone qualified to determine appropriate restrictions for those who may be at risk of self-harm.

207.    Instead, Taft left all decisions regarding such restrictions to wholly unqualified correctional officers.  This is a serious, fundamental breach of Taft's duty to his patients.

208.    At the same time, no one at the jail was qualified to recognize mental health emergencies when they occurred, and Taft had no policies in place to deal with any such emergencies.

---

[42] *See Gates v. Cook*, 376 F.3d 323, 342–343 (injunction requiring a correctional facility "to comply with ACA and National Commission on Correctional Healthcare standards regarding mental health" affirmed as justified by the Eighth Amendment).

209.     Moreover, as described in detail above, the jail's express policies regarding suicide prevention—which were under Taft's authority as the designated mental health provider—went far beyond reasonable and necessary precautions, thus constituting unlawful punishment.  In other words, those restrictions had no justifiable purpose, and were therefore unlawful conditions of confinement.  This was exacerbated by the fact that they were arbitrarily enforced at the discretion of correctional officers with no mental health training.

210.     As a result, (a) Alexander was subjected to harmful, unwarranted restrictions excessive in relation to the stated purpose of preventing self-harm; (b) these restrictions were in place for more than five days at the sole discretion of correctional officers without ever being assessed by a qualified professional for their appropriateness; and (c) when Alexander's mental health deteriorated dramatically, no one was available who could recognize the emergency, and no policies were in place to respond to such an emergency.  Thus, Alexander remained in the violent cell under the same harmful conditions that were causing his mental deterioration when he should have been receiving emergency treatment.

211.     These policies were adopted by Taft with deliberate indifference to the rights of inmates such as Alexander.  This is evident from the fact that they fall far short of the NCCHC standards, of which Taft should have been aware as a psychologist providing correctional mental health care.

212.     Therefore, the Taft Defendants can be individually liable under § 1983 for deciding, in their supervisory and/or policymaking capacity, to institute the fundamentally flawed system of mental health care described above.[43]

---

[43] Note that the the fact Taft failed to *actually* supervise the mental health care at the jail does not relieve him of his duty to do so, which he took on when he contracted with the County to provide the mental health care at the jail.

213.    In a related but separate claim, Taft's non-existent system of mental health care additionally allowed an abusive environment to exist at the jail.

214.    Taft had no policies and provided no training whatsoever regarding the identification and prevention of abuse by correctional officers.  This is a known, serious risk, which the National Committee on Correctional Health Care has recognized since 2007.  As noted above, Taft was also aware that his suicide prevention policy, on its face, subjected inmates to harmful, unwarranted suicide restrictions at the discretion of correctional officers with no mental health training.  His sole employee was additionally aware that jail staff were subjecting inmates to other mistreatment in the violent cell, such as the deprivation of water and basic human hygiene.  Still, Taft did nothing.  This total failure to have any policies or training to prevent abuse was a moving force behind Alexander's injuries.

### *Henderson County*

215.    The claims described above against the Taft Defendants are invoked equally against Henderson County, which is responsible for the unlawful policies of its private contractor (or alternatively, the contractor's policies are in fact the policies of the County).  The County has a non-delegable duty to provide care to its inmates at the Jail.

216.    In a related but separate claim, the jail had established practices of using confinement in the violent cell as a means of punishment, separate from any consideration for risk of self-harm.  Plaintiff has identified many individual examples of such practices, described in detail above.

217.    These practices were known to and condoned by some of the highest-ranking officials at the jail.  Further, the violent cells are located in the central part of the Jail, where ranking

officers and jail administrators spend most of their time.  Moreover, the practice is so widespread, the county policymaker must have had at least constructive knowledge of it.

218.    These practices were a moving force behind the injuries suffered by Alexander.

### The CO Defendants

219.    The CO Defendants each subjected Alexander, a pretrial detainee at the Henderson County Jail, to unlawful punishment.

220.    Each of the CO Defendants worked one or more 12-hour shifts during which they personally subjected Alexander to sleep deprivation, dehydration, dangerously unsanitary conditions, and deprivation of access to even the most basic elements of personal hygiene (see above, ¶¶ 41–96 for allegations specific to individual Defendants).

221.    Each of the CO Defendants was well aware of the serious danger they were placing Alexander in when they intentionally subjected him to such treatment, yet they chose to subject him to it anyway, for approximately 128 consecutive hours.  The conditions Alexander was subjected to served no justifiable purpose, and therefore constituted punishment.

222.    Not only do all inmates have a right of access to basic human hygiene and other needs, but pretrial detainees such as Alexander have a right to be free from punishment of any kind.

223.    Therefore, the intentional punishment of Alexander and denial of basic human needs by the CO Defendants violated his clearly established rights under the due process clause of the Fourteenth Amendment.

224.    The deliberate indifference of the CO Defendants towards Alexander's basic human needs was evidenced by their participation in and/or condoning of extensive verbal abuse directed at Alexander without any provocation.

225.    The abuse described above caused severe mental and physical harm to Alexander.

## VI.    SECOND CAUSE OF ACTION: NEGLIGENCE

226.    All preceding paragraphs are incorporated herein by reference.

227.    The Taft Defendants and SHP, as well as their employees at the jail, were contracted medical providers for the Henderson County Jail.  Therefore, they had duties to provide competent medical care to Ronnie Alexander while he was detained at the jail.  Because of the custodial environment that Alexander was in, they had further duties to protect him from abuse by others and to report any such abuse as soon as they became aware of it.

228.    Employees of Taft and SHP breached their duties by abjectly failing to meet the standard of care for safeguarding the wellbeing of Alexander, an inmate–patient under their care. SHP and Taft are vicariously liable for the conduct of their employees, which was performed entirely within the course and scope of their employment.

229.    To whatever extent the procedural requirements of Chapter 74 of the Texas Civil Practice and Remedies Code apply to a suit filed in federal court, Plaintiff provided notice and medical release authorizations to Taft and SHP prior to filing suit, as per that Chapter.

### *The Taft Defendants*

230.    Jessica Phlips, an employee of Taft, personally observed Alexander's worsening mental health, which she was specifically responsible for caring for.  She took no action at all to remedy the situation, instead allowing Alexander to remain indefinitely in isolation, subjected to extreme and unreasonable suicide precautions, and deprived of numerous basic human needs. Phlips failed to report Alexander's worsening mental health to anyone.  She also took no steps to ensure she, or any other person, followed up on Alexander's mental health status.  Phlips also was aware that inmates in the violent cell were frequently deprived of basic essentials, and that the

cells smelled like human waste.  However, she took no steps to report these issues to anyone with the authority to correct them.

231.    In addition to liability for Phlips's conduct, Taft's system of mental health care at the Jail was grossly inadequate (see above, ¶¶ 106–156 and 204–214).

232.    As a result, (a) Alexander was subjected to harmful, unwarranted restrictions excessive in relation to the stated purpose of preventing self-harm; (b) these restrictions were in place for more than five days at the sole discretion of correctional officers without ever being assessed by a qualified professional for their appropriateness; and (c) when Alexander's mental health deteriorated dramatically, no one was available who could recognize the emergency, and no policies were in place to respond to such an emergency.  Thus, Alexander remained in the violent cell under the same harmful conditions that were causing his mental deterioration when he should have been receiving emergency treatment.

233.    Furthermore, Taft took no steps whatsoever to identify or report abuse by correctional officers at the Jail, despite his employee's knowledge of abusive conditions in the violent cell.  This is contrary to the national standard of care.

234.    Taft's actions and/or inactions were the cause-in-fact and proximate cause of serious harms suffered by Alexander, namely, physical and mental suffering during and after five consecutive days of isolated confinement, sleep deprivation, dehydration, dangerously unsanitary conditions, and deprivation of access to even the most basic elements of personal hygiene.

### Taft: Gross Negligence

235.    As described above, Taft's system of providing mental healthcare at the Jail was grossly inadequate.

236.     As such, Taft was aware of a serious risk (in fact, an inevitability) that inmates at the Jail who were identified as suicidal would be subjected to far more extreme restrictions, and for a longer time period, than a reasonable psychologist would deem appropriate.  He also knew that he was placing these inmates' mental wellbeing completely in the hands of unqualified correctional officers, who have their own (decidedly non-clinical) reasons to treat certain inmates more or less harshly.

237.     In instituting his system of mental health care, as described above, Taft completely ignored this risk.  These failures directly harmed Alexander, as described above.

### *SHP*

238.     SHP staff at the Jail completely failed to monitor the health and general wellbeing of Alexander, an inmate–patient under their care.  This is despite the fact that Alexander was both (a) on suicide watch and (b) on SHP's alcohol withdrawal protocol, both of which call for frequent, direct monitoring by medical staff.  In fact, SHP staff failed to examine Alexander at all after he was placed in the violent cell, even though they had previously been monitoring him for high blood pressure he had suffered prior to his transfer to the violent cell.

239.     This total failure breached the standard of care reflected in both SHP's own written policies and the nationally recognized NCCHC standards.

240.     Beyond the monitoring dictated by written policy, SHP should have been alerted to the danger to Alexander's health posed by confinement in the violent cell, because they were aware that this cell had no toilet, shower, or running water.  A lack of access to drinking water is especially dangerous for someone who may be withdrawing from alcohol.  Furthermore, the violent cell is directly observable from the nurses' station, so they would have known that Alexander was not being let out of his cell to take a shower, use a toilet, or for any other reason.

241.    Had they paid even the most cursory attention to Alexander, they would have noticed his mental state and general wellbeing deteriorated significantly after being placed in the violent cell.  This should have been reported to Taft or the SHP physician, who would then have ordered further professional examination of Alexander and appropriate treatment, housing, and/or conditions of his confinement.

242.    SHP's actions and/or inactions were the cause-in-fact and proximate cause of serious harms suffered by Alexander, namely, physical and mental suffering during and after five consecutive days of isolated confinement, sleep deprivation, dehydration, dangerously unsanitary conditions, and deprivation of access to even the most basic elements of personal hygiene.

## VII.    DAMAGES

243.    As a direct and proximate result of the above-described acts and omissions of Defendants, and/or individuals for whom the Defendants are legally responsible, Plaintiff has suffered serious damages.  Accordingly, Plaintiff seeks to recover all actual, compensatory, and exemplary damages which have resulted from Defendants' above-described conduct.  These damages include, but are not necessarily limited to, the following:

a)  Physical suffering;

b)  Mental pain and anguish, both past and future;

c)  Lost wages;

d)  The cost of medical care and/or counseling necessitated by the harms done to him;

e)  Punitive damages against all Defendants, where applicable;

f)  Pre- and post-judgment interest in accordance with Texas law.

## VIII.    JURY DEMAND

244.    Plaintiff demands a trial by jury.

## IX.   RELIEF REQUESTED

245.   For the reasons stated above, Plaintiff Ronnie Alexander requests that Defendants be summoned to appear and answer herein and that upon final trial or hearing, a judgment be entered in favor of the Plaintiff and against the Defendants as follows:

a) Awarding Plaintiff actual damages in an amount that is within the jurisdictional limits of this Court;

b) Awarding Plaintiff punitive or exemplary damages in an amount that is within the jurisdictional limits of this Court;

c) Awarding Plaintiff reasonable and necessary attorney's fees and costs of court;

d) Awarding Plaintiff pre-judgment interest at the highest rate permitted by law;

e) Awarding Plaintiff post-judgment interest at the highest rate permitted by law; and

f) Awarding Plaintiff all such other and further relief, at law or in equity, to which he may show himself to be entitled.


Respectfully submitted,

By: /s/ *Roger Topham*
     Roger Topham
     State Bar #24100557
13809 Research Blvd. Suite 500
Austin, Texas 78750
(512) 987-7818
rt@tophamlaw.com

Jeff Daniel Clark
State Bar #24109732
The Justice Foundry PLLC
550 Reserve Street Suite 190
Southlake, Texas 76092
(817) 953-8699
jdc@jdanielclark.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on July 10, 2023, a copy of this filing was served on counsel for all parties through the Court's ECF system.

/s/ *Roger Topham*
Roger Topham